**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**                     Case No.: 20-cv-00018-AT-SLC
------------------------------------------------------------------------x
REDCELL CORP. and REDCELL SYSTEMS, LLC,

                                        Plaintiffs,
                -against-

A. J. TRUCCO, INC. and TRUCCONOVA, LLC,

                                        Defendants.
------------------------------------------------------------------------x


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE EXPERT REPORT AND TESTIMONY OF J. CHRISTOPHER WESTLAND, PhD, CPA


                              RUSS & RUSS, P.C.
                              Attorney for Plaintiffs
                              Post Office Address:
                              543 Broadway
                              Massapequa, New York 11758
                              (516) 541-1014
                              jayruss@russrusspc.com

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT……………………………………………………………1

STATEMENT OF FACTS ....................................................................................................1

    A.  Defendants Utilize Their Belatedly Produced Financials
        in a Bad-Faith Effort to Undercut Professor Westland ........................................2

    B.  Defendants Ignore That Professor Westland Specifically
        Addresses "Major Variables" ................................................................................13

    C.  Defendants Ignore Professor Westland's Credentials
        and Business Valuation Expertise..........................................................................17

ARGUMENT .......................................................................................................................19

    A. Legal Standard ......................................................................……………………19

    B. Application of the Legal Standard ........................................................................24

CONCLUSION....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Case</u>                                                                                                    <u>Page(s)</u>

<u>Clerveaux v. East Ramapo Central School District</u>,
      984 F.3d 213 (2d Cir., 2021)..................................................................................22, 23

<u>Cook v. Rockwell Int'l Corp.</u>,
      580 F. Supp.2d 1071, 1083 (D. Colo., 2006)....................................................20

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,
      509 U.S. 579 (1993)......................................................................................19, 20, 21

<u>Elcock v. Kmart Corp.</u>,
      233 F.3d 734, 741-46 (3d Cir. 2000) .................................................................21

<u>Hose v. Chicago Northwestern Transp. Co.</u>,
      70 F.3d 968 (8th Cir., 1995) ..............................................................................20

<u>In re Paoli R.R. Yard PCB Litig.</u>,
      35 F.3d 717, 742 (3d Cir. 1994).........................................................................21

<u>Kannankeril v. Terminix Int'l, Inc.</u>,
      128 F. 3d 802 (3d Cir. 1997)..............................................................................20

<u>Keurig, Inc. v. Sturm Foods, Inc.</u>,
      2013 WL 633574, at *1 (D. Del. Feb. 19, 2013)
      affirmed, 732 F.3d 1370 (3d Cir., 2013)............................................................19

<u>Southland Sod Farms v. Stover Seed Co.</u>,
      108 F. 3d 1134 (9th Cir., 1997) .........................................................................20

<u>Stollings v. Ryobi Techs, Inc.</u>,
      725 F.3d 753, 768 (7th Cir., 2013) ............................................................... 21-22

<u>United States v. Mitchell</u>,
      365 F.3d 215, 244-45 (3d Cir. 2004) .................................................................20

<u>United States v. Romano</u>,
      794 F.3d 317, 330 (2d Cir. 2015).......................................................................21


<u>Federal Statues and Rules</u>
FRCP Rule 26(a)(l) .....................................................................................................10

FRCP 37(c) .................................................................................................................10

FRE 401 ...................................................................................................................21

FRE 702 .........................................................................................................20, 21, 24

FRE 703 ...................................................................................................................22

FRE 705 ...................................................................................................................22

**<u>Other Authorities</u>**
Jack B. Weinstein & Margaret A. Berger,
<u>Weinstein's Federal Evidence</u> § 702.02[1] (2d Ed. 2005)................................................20

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted by Plaintiffs in opposition to the motion by Defendants to exclude the testimony of Plaintiffs' expert, J. Christopher Westland, PhD, CPA ("Professor Westland"), which is set forth in his initial report dated May 12, 2021[1] and his Rebuttal Report dated July 22, 2021.[2]

## STATEMENT OF FACTS

Contemporaneous herewith, Plaintiffs have moved by Notice of Motion (the "Motion") to exclude the expert report and testimony of Defendants' rebuttal expert, Mark Gottlieb, CPA. Plaintiffs respectfully request that the Court consider the Plaintiffs' Motion as part of their opposition to Defendants' motion since Plaintiffs rely upon the same three (3) expert reports, facts, statutes and case law.  Plaintiffs' Motion is incorporated herein by reference.

Defendants' motion to exclude Professor Westland's reports and testimony relies almost exclusively on Mr. Gottlieb's Rebuttal Report (Doc. No. 82-3; the "Gottlieb Rebuttal").  However, the Gottlieb Rebuttal is neither the standard nor the basis upon which the Court should determine if Professor Westland's reports, and anticipated testimony, should be judged for admissibility at trial.  The Gottlieb Rebuttal is simply "fodder for cross-examination."

Professor Westland has powerful credentials; Mr. Gottlieb's credentials pale in comparison.  Professor Westland has a PhD in Computers & Information Systems, an MBA in Accounting, and a BA in Mathematics.  Professor Westland is a Certified Public Accountant ("CPA"), just as Mr. Gottlieb.  Professor Westland has been a member of the faculty of the University of Illinois-Chicago since 2007.  He has authored numerous books, software and publications, which include authoritative books on computers, information science, statistics, and

---

[1] Filed by Defendants as Doc. No. 82-2.
[2] Filed by Defendants as Doc. No. 82-4.

1

business valuation.  Professor Westland's Curriculum Vitae was served on defense counsel with his initial report.  A copy of the letter of transmittal dated May 12, 2021 is annexed to the accompanying declaration of Jay Edmond Russ, Esq. ("Russ Decl.") as Exhibit "A."  A copy of Professor Westland's Curriculum Vitae (attached to the May 12, 2021 letter of transmittal) is separately annexed to the Russ Decl. as Exhibit "B".

Defendants' motion asserts five (5) alleged grounds to strike Professor Westland's report. Plaintiffs consolidate those grounds into three (3) categories and address them herein.  Defendants do not otherwise object to the documents and data used by Professor Westland, or to the methodologies he employed, or to the Bayesian A/B analysis that is at the core of Professor Westland's opinions.

A.    Defendants Utilize Their Belatedly Produced Financials
in a Bad-Faith Effort to Undercut Professor Westland

In their first and second arguments, Defendants object to a small, discrete, and limited portion of the data which Professor Westland considered in his initial report, and his development of *pro forma* financial statements as one of the steps in his methodology.  Defendants argue that Professor Westland's conclusions should be disregarded because this small portion of data comes from a source which Defendants falsely describe in a footnote as "illicitly obtained by Redcell" (Defendants Memorandum pg. 5 fn 2).

Defendants have made this argument before, which the Court has rejected.  Defendants obviously refer to the "Joint Database" of documents to which all parties had access prior to the commencement of the action, and which was disclosed by Plaintiffs at the outset of this case.  The existence of the Joint Database, and Plaintiffs' access to it, was disclosed by Plaintiffs numerous times in discovery, including, without limitation, Plaintiffs' response to Defendants' First Demand for Discovery and Inspection made on July 3, 2020 (Doc No. 59-3; See Russ Decl. dated June 7,

2

2021 [Doc. No. 59]), and then in Plaintiffs' Memorandum of Law dated June 7, 2021 (Doc. No. 60). Plaintiffs, in their discovery response from July 3, 2020 (Doc No. 59-3),[3] stated:

> The Joint Database arose from the business relationship between Plaintiffs and Defendants whereby documents, communications and electronic data were generated/created daily because of Plaintiffs' active operation of portions of Defendants' business. Without limiting the foregoing, the Joint Database consists of:
>
> a. Plaintiffs and Defendants have the Cloud Storage and Back up (!Backup) containing approximately 1TB OF Data from the ongoing backup of the Defendants' servers up to the commencement of the action. Thereafter, Defendants removed Plaintiffs' access. As of the date of commencement of this action, and continuing, Defendants had and still have sole and exclusive access to this category of producible documents, communications and electronic data, and it is Defendants' obligation to produce same to Plaintiffs.
>
> b. Plaintiffs and Defendants have the RDS SERVER (Desktop Terminal server and organization documents storage) including a copy of accounting system QuickBooks and related operations data with the exception of mailboxes hosted at Microsoft Exchange online from the ongoing backup of the Defendants' servers up to the commencement of the action. Thereafter, Defendants removed Plaintiffs' access. As of the date of commencement of this action, and continuing, Defendants had and still have sole and exclusive access to this category of producible documents, communications and electronic data, and it is Defendants' obligation to produce same to Plaintiffs.
>
> c. Plaintiffs and Defendants have the SQL SERVER (DATABASE SERVER FOR PLEXUS IMP APPLICATIONS) from the ongoing backup of the Defendants' servers up to the commencement . of the action. Thereafter, Defendants removed Plaintiffs' access. As of the date of commencement of this action, and continuing, Defendants had and still have sole and exclusive access to this category of producible documents, communications and electronic data, and it is Defendants' obligation to produce same to Plaintiffs.
>
> d. Plaintiffs and Defendants have the WEB SERVER (HOSTED APPLICATIONS INCLUDING PLEXUSWEB SERVICES, PCN, VENDORS PORTAL) from the ongoing backup of the Defendants' servers up to the commencement of the action. Thereafter, Defendants removed

---

[3] The June 7, 2021 Russ Declaration is annexed to the Russ Decl. as Exhibit "C." Plaintiffs' response to the Defendants' First Demand for Discovery and Inspection dated July 3, 2020 is annexed as Exhibit "D." The Memorandum of Law dated June 7, 2021 is annexed as Exhibit "E."

Plaintiffs' access. As of the date of commencement of this action, and continuing, Defendants had and still have sole and exclusive access to this category of producible documents, communications and electronic data, and it is Defendants' obligation to produce same to Plaintiffs.

e. Plaintiffs and Defendants have the SBS SERVER (AND BACKUP SERVER) from the ongoing backup of the Defendants' servers up to the commencement of the action. Thereafter, Defendants removed Plaintiffs' access. As of the date of commencement of this action, and continuing, Defendants had and still have sole and exclusive access to this category of producible documents, communications and electronic data, and it is Defendants' obligation to produce same to Plaintiffs.

Plaintiffs recommend and formally request that Plaintiffs and Defendants jointly engage a forensic technology company to compare and contrast the Joint Database to certify a) that they are identical up to the date of commencement of this action, and to correct/restore any portions of it which are missing or incomplete so that Plaintiffs and Defendants and the Court have confidence that the parties have identical documents, communications and electronic data in the Joint database, and b) descriptive/classification information as to additions to the Joint Database from the date of commencement of the action to the date of examination by the forensic technology company, to assure full and complete production by Defendants to Plaintiffs consistent with demands.

Plaintiffs, in their Memorandum of Law dated June 7, 2021 (Doc. No. 60), stated without contradiction:

In reality, Defendants have known of the Joint Database because it was part of the business conducted by the parties. Plaintiffs not only provided IT support for Defendants, but also provided personnel to operate Defendants' day-to-day business. All of this is alleged in the Verified Complaint. The Joint Database includes this massive documentation by Plaintiffs of their work which was performed by Plaintiffs' staff, and thousands of other documents and records, all accessed routinely by the parties. Defendants should have informed their counsel of the existence of the Joint Database.

Regardless, Plaintiffs' counsel notified Defendants' counsel of the existence of the Joint Database as part of Plaintiffs' very first document response made on July 3, 2020. In fact, Plaintiffs' counsel offered to catalogue these documents with defense counsel's input. Our offer was ignored by Defendants' counsel.

(*Memorandum pgs. 3-4*)

Plaintiffs have been transparent in their use of the Joint Database materials. Defendants also have had unfettered access to the Joint Database, which they never have denied. They do not deny that the Joint Database was maintained by Plaintiffs and Defendants when their business relationship was intact. Defendants' allegation that Plaintiffs "illicitly obtained" the information on the Joint Database is plainly false.

As to Professor Westland's development of *pro forma* financial statements in his initial report, the record establishes that Professor Westland went to great lengths to explain his generally-accepted and good faith process, which was initially hampered by Defendants' failure to comply with their discovery obligations and produce their financial documents in a timely manner.

As per the Order dated March 2, 2021 (Doc. No. 45),[4] Plaintiffs were required to serve Professor Westland's initial expert report not later than May 12, 2021. However, Defendants still had not produced their tax returns and financial statements. As a result, Plaintiffs were compelled to seek the Court's intervention to compel the production of the Defendants' tax returns and financial statements, which was granted and memorialized in the Court's June 10, 2021 Order (Doc. No. 63).[5] The June 10 2021 Order directed Defendants to produce their tax returns and other financial documents by June 24, 2021.

Professor Westland was compelled to engage in a two-step process. First, Professor Westland had to prepare his initial expert report (Doc. No. 82-2) based, in part on Defendants' incomplete production of financial documents. Then, after Defendants produced additional documents after the entry of the June 10, 2021 Order, Professor Westland submitted his supplemental report on July 22, 2021 (Doc. No. 82-4).

---

[4] The Order dated March 2, 2021 is annexed as Exhibit "F."
[5] The Order dated June 10, 2021 is annexed as Exhibit "G."

Not surprisingly, Mr. Gottlieb criticized Professor Westland for proceeding in that manner. However, Professor Westland explained his process and the need for it in his rebuttal report. Contrary to Defendants' assertion, Professor Westland did not create "stand alone *pro formas*". Rather, Professor Westland created data points for use in his analysis. The important point to emphasize here is that Professor Westland utilized generally accepted and reliable methodologies.

The *pro forma* statements appear in Appendix A of Professor Westland's initial report (Doc. No. 82-2). The restatement to constant dollars is detailed in Appendix B (Id.). Statistical calculations for the damages are clearly presented in Appendix C. Nothing in Professor Westland's analysis is "self-manufactured" because the full list of documents relied upon, including the documents used to reconstruct Defendants' financial statements, is delineated in Appendix H. Copied below are the pro forma statements from Technical Appendix A.

| account | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| sales_net | 93603.62 | 86023.50 | 82481.00 | 85196.66 | 67423.65 | 64811.89 | 56235.4827064 | 49585.6440262 | 44285.091489 | 39068.00 | 34857.00 | 34857.00 |
| cgs | 84058.66 | 77251.50 | 73659.00 | 76508.98 | 60548.32 | 58202.88 | 50297.0201078 | 44209.0091149 | 39383.417115 | 35469.00 | 30640.00 | 30640.00 |
| sga | 6545.02 | 6015.00 | 7289.00 | 5957.19 | 4714.45 | 4531.83 | 4328.4968755 | 4141.8240359 | 3969.875000 | 3811.00 | 3526.00 | 3526.00 |
| income_net | 2934.65 | 2697.00 | 1533.00 | 2671.08 | 2113.86 | 2031.98 | 1786.1470107 | 1500.5698348 | 1145.911552 | 612.00 | 621.00 | 621.00 |
| cash | 2960.77 | 2721.00 | 3621.00 | 2694.85 | 2132.67 | 2050.06 | 1617.7761778 | 1331.0209423 | 1127.536010 | 976.00 | 193.00 | 193.00 |
| ar | 10953.53 | 10066.50 | 7296.00 | 9969.74 | 7889.94 | 7584.31 | 6915.3394626 | 6174.3140611 | 5331.273744 | 4327.00 | 4453.00 | 4453.00 |
| inv | 2510.29 | 2307.00 | 1391.00 | 2284.83 | 1808.18 | 1738.14 | 1605.8902189 | 1461.7246393 | 1301.690371 | 1119.00 | 1468.00 | 1468.00 |
| pe_net | 4131.04 | 3790.50 | 1010.00 | 3700.01 | 2975.03 | 2800.30 | 2499.0109652 | 2077.1453099 | 1543.053365 | 669.00 | 657.00 | 657.00 |
| asset_other | 749.17 | 688.50 | 40.00 | 681.88 | 539.63 | 518.73 | 465.3729236 | 405.0476194 | 333.999725 | 243.00 | 241.00 | 241.00 |
| cur_liab | 18557.83 | 17055.00 | 10625.00 | 16891.07 | 13367.40 | 12849.59 | 11520.1480282 | 10015.7850685 | 8241.266925 | 5960.00 | 5679.00 | 5679.00 |
| treas_stk | 685.51 | 630.00 | 420.00 | 623.94 | 493.78 | 474.66 | 461.6021518 | 448.1640360 | 434.310358 | 420.00 | 420.00 | 420.00 |
| re | 2955.87 | 2716.50 | 907.00 | 2690.39 | 2129.14 | 2046.67 | 1928.3361207 | 1802.2498396 | 1666.652716 | 1519.00 | 1474.00 | 1474.00 |
| sh_distrn | -1460.80 | -1342.50 | -898.00 | -1329.60 | -1052.23 | -1011.47 | -920.6924351 | -819.9257946 | -704.899288 | -567.00 | -485.00 | -485.00 |
| kiwi-sales | 33253.00 | 28528.00 | 29413.00 | 25924.00 | 22435.00 | 26152.00 | 22300.6309677 | 18999.5376840 | 16172.539307 | 13753.66 | 11994.88 | 11994.88 |
| fruit_other_sales | 35845.00 | 32044.00 | 34284.00 | 36968.00 | 27337.00 | 21692.00 | 20369.7637948 | 18955.5259455 | 17426.903544 | 15750.63 | 13736.49 | 13736.49 |
| tot_fruit_sales | 69098.00 | 60572.00 | 63697.00 | 62892.00 | 49772.00 | 47844.00 | 41512.9176423 | 36604.0233958 | 32691.831556 | 29504.30 | 25731.37 | 25731.37 |
| pct_kiwi | 0.48 | 0.47 | 0.46 | 0.41 | 0.45 | 0.55 | 0.4039182 | 0.3173126 | 0.260274 | 0.22 | 0.19 | 0.19 |
| sales_other | 24505.62 | 25451.50 | 18784.00 | 22304.66 | 17651.65 | 16967.89 | 15598.1951554 | 14096.0417944 | 12413.438935 | 10463.70 | 9125.63 | 9125.63 |

Professor Westland fully and unambiguously identified the documents and data that he used, and his generally accepted methodologies. During his deposition (See Doc. No. 82-5),[6] Professor Westland also offered to provide Defendants with a further analysis upon request.[7] Defendants declined Professor Westland's offer. Moreover, prior to Professor Westland's deposition, defense counsel made specific requests for data in an email, which request was honored and satisfied by email. Defense counsel made no other requests for documents or for data.

Professor Westland's deposition testimony also refers to certain appendices to his reports that set forth the documents and data that he relied on. Defense counsel had plenty of time to examine Professor Westland under oath. They also could have requested addition documents or data. The transcript of Professor Westland's deposition establishes that Professor Westland was transparent and cooperative with defense counsel, and that he also told defense counsel: "I'm happy to send you anything you would like." (Westland Tr.; Page 48 lines 24-25) We quote from portions of Professor Westland's deposition testimony:

> Q. Is this the Appendix H of your initial report, the technical index?
> A. It is indeed. It's on -- it starts on page 50.
> *(Westland Tr.; Page 15 line 6 to line 22)*

*       *       *

> Q. So you pulled open the index. That's what I thought you were going to refer to, Chris. Well, I just don't have the -- what's the page number? I'm going to go to H.
>
> A. It's page 50.

---

[6] The transcript of Professor Westland's ("Westland Tr.") is filed as Doc. No. 82-5.

[7] See page 48, line 20-25 of Westland Tr.:
> Q. Yeah. And I appreciate you providing responses to that information provided and, you know, if there's any further requests we can make them through your counsel for this type of information.
>
> A. I'm happy to send -- yeah. I'm happy to send you anything you would like.

Q. Okay. Okay. So this is the list that you're referring to amounted to about 5,000 pages. Is that right?

A. Yes. Yes. And I had this in a folder, and so I simply went down the folder and took copies of the file names without -- well, I guess in some cases with their suffix, but in general I tried to get them without their suffix. So what you see here is what I was given. This was all as -- it was all in digital format, so everything I looked at was basically going through digital files.

(*Westland Tr.; Page 18 line 25 to page 19 line 16*)

*            *            *

Q. Okay. So Technical Appendix A. Now, in the second sentence it says, "I used industry best practice methods for both cross-sectional and time-series methods to interpolate missing data." So that's the second sentence. I guess the first question I have is what data that was not missing did you utilize in connection with this report? I think I know the answer based on our previous conversation, but I want to hear it from you.

A. It would have been -- again, I'd have to look at my list in Appendix H, but it would have been the financial reports that I listed in Appendix H. This is the only financial information that was given to me.

(*Westland Tr.; Page 44 line 6 to line 20*)

*            *            *

A. Let me switch down to Appendix H, and then I can switch back up to Appendix A.

Q. Okay.

A. So here we are at Appendix H. So if you go down here -- and I can actually get through these. For example, I have A.J. Trucco 2017, 2018 financial statements, okay, so what that would have given me is two years times, if you're talking data points, the number of line items of financial information that are in those statements. Now, not all of the documents that I received would have had the same level of resolution in their accounts, and so what I did was took standard aggregation methods we use in accounting to basically make all of the financial statements comparable. The true calculation of damages under the defense against trades secrets act, I only need really the sales, the cost of sales, and the selling general administrative expense, so I would aggregate things there. Some of these financial statements just had massive amounts of detail at the individual fruit level, so we had to -- we essentially had to aggregate those to get -- to get those into a format where I could use them for damage calculation. If I

wanted -- if I go down here, there were -- let's see. We have Trucco, I believe these are sales. I would have to look inside. 2014 to 2019 fruit sales. This is a pdf, so I actually had to pull this in via -- I use Tesseract inside R. It's an OCR scanning program to pull these things into my files in R. I have Trucco's 2018 income statement, 2016, 2017 financial statement, 2017 tax return. Seems somewhere in there I had another tax return too. These might be financial statements as well. I would need to look inside, but assuming you have access to these particular documents, and the ones you don't I'm certainly happy to share with you, you would know exactly what financial items I had. **You also have access to all of my files. I have tried to be very candid in my presentation of code, as well as my data, in my initial report, and then I forwarded the – the additional information you had asked for last week**, so that's in a downloadable file in my Google Drive account.

Q. **Yeah. And I appreciate you providing responses to that information provided and, you know, if there's any further requests we can make them through your   counsel for this type of information.**

A. **I'm happy to send -- yeah. I'm happy to send you anything you would like.**

(*Westland Tr.; Page 46 line 22 to page 48 line 25*; Emphasis added)

The above exchange relates to defense counsel's pre-deposition written request for documents and data from Professor Westland, and Professor Westland's responses thereto.

Defendants, at page 13 of their Memorandum of Law, assert that Professor Westland did not produce documents and information prior to his deposition.  Defense counsel submitted some emails, but not all, of the emails exchanged (Doc. 82-6).   However, defense counsel did not annex the full set of pre-deposition emails.  Annexed to the Russ Decl. as Exhibit "H" are several pre-deposition email communications between Plaintiffs' counsel, defense counsel, <u>and Professor Westland.</u>   In the first, defense counsel makes specific requests for documents and data from Professor Westland.  In the second, Plaintiffs' counsel agrees to produce everything and poses questions.  In the third, defense counsel clarifies his requests.  In the fourth, Plaintiffs' counsel confirms that the documents and data will be provided prior to Professor Westland's deposition. In the fifth, defense counsel confirms.

The last email was sent by Professor Westland on Sunday evening, August 15, 2021 directly to defense counsel.  Professor Westland personally provided defense counsel with the documents and data requested via a Google link and responded to his queries.  Professor Westland's email contains the subject "Folder shared with you" "response_to_queries".  Professor Westland linked to thirteen separate documents.  The email states in relevant part: "Please find my responses to your queries concerning Redcell v. Trucco."  <u>Among the documents that Professor Westland via the Google link to defense counsel sent was a twelve page supplemental document dated August 14, 2021 which he titled "Response to Queries concerning Files in Expert Opinion on Redcell Corp. and Redcell Systems LLC v. A.J. Truco Incl and Truccanova, LLC for Russ & Russ PC"</u> (See Exhibit "I" to Russ Decl.).

Contrary to Defendants, Plaintiffs never failed to produce timely and adequate expert disclosure.  Plaintiffs have fully responded to Defendants discovery demands.  Plaintiffs are not in violation of Federal Rules of Civil Procedure ("FRCP") 37(c).  If Defendants actually believe that they do not have all the data upon which Professor Westland relied - even though they did not take Professor Westland up on his offer - their requests now or prior to trial can, and will, be satisfied.  Accordingly, any alleged failure to provide documents or data to Defendants is harmless, in the words of FRCP 37(c).  Since there has been no violation of FRCP 26(a)(l), it follows that a sanction under FRCP 37(c) is unwarranted.  Under FRCP 37(c)(l), even if documents or data had not been provided – which is not the case - exclusion of evidence is not automatic if the alleged failure to disclose was substantially justified or harmless.

Interestingly, but not surprisingly, Professor Westland's initial calculation of damages was conservative and understated once Professor Westland was provided the documents which

Defendants produced in response to the June 10, 2021 Order.  As Professor Westland stated in his

July 22, 2021 Rebuttal Report:

>…Using the actual financial statements from (Gottlieb's) exhibits 1, 2, 4, 5 and 6" and determined that "…my original damage estimates are <u>conservative and understated</u>, partly due to the faster thanestimated growth of Trucco's actual business in 2019-2021.
>
>(*Doc. No. 82-4; Westland Rebuttal Report, pg. 2*)

*          *          *

>…despite being denied key financial information under discovery… my interpolations provided financial information that was generally within 10% of the key financial figures used in damage calculation" and "… I stand by the damage estimates presented previously in my opinion…" and Defendants "unjustly enriched themselves in 2019 through 2021 by their misappropriation of Redcell's PLEXUS IMP software in 2019…
>
>(*Doc. No. 82-4; Westland Rebuttal Report, pg. 1*)

*          *          *

>Briefly, here are the steps were taken to analyze the accounts and operations of A.J. Trucco before and after the licensing and installation of the PLEXUS IMP software and to compute Trucco's unjust enrichment. <u>Details and results of calculations are presented in the technical appendices.</u>
>
>1.    Extraction of financial information from discovery documents, internal reports and external web scraping. This data was curated into a set of financial statements spanning the years 2008 through 2019.
>
>2.    The curated financial statements data set contained periods and accounts with missing data. I used <u>industry best-practice methods</u> for both cross-sectional and time-series methods to interpolate missing data. <u>The technical appendices provide details.</u>
>
>3.    All financial data was de-trended, to remove the impact of appreciating dollar amounts due to inflation and business growth from 2007 through 2019. Without de-trending, business value and profits on sales after the installation of PLEXUS IMP would be dramatically overstated, because the later numbers are substantially larger than earlier numbers. Detrending of data eliminates this problem and states all periods in the equivalent of 2013 (midpoint) dollars. Detrending used methods recommended in (Hyndman and Koehler 2006).

11

4.    <u>Industry best practice</u> Bayesian A/B tests were performed of the years PLEXUS IMP was installed (B) versus the years it was not (A). <u>The technical appendices provide details.</u>

5.    The value added to Trucco's business with the licensing and installation of the PLEXUS IMP software is the difference in posterior Bayesian means under scenario (A) versus scenario (B). The <u>technical appendices provide detail</u> and relied on methods recommended in (Kass and Vaidyanathan 1992) and (Kass and Wasserman 1995).

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 29*)

Professor Westland describes the methods to interpolate missing data (Damodaran 2011)

as "<u>industry best-practice</u>" (*Doc. No. 82-4; Westland Rebuttal Report, pg. 29-30*) and adds:

…Only detrended financials were used to compare Trucco's pre-2013 and post-2013 performance. These are the A and B of the Bayesian A/B analysis…. My Bayesian A/B testing was a <u>scientific way</u> to compare two responses (e.g., financial performance) to variant A against variant B. In the context of this legal case, the variants were: A) The financial performance of Trucco's operations before the upgrade of their systems to PLEXUS IMP in 2013, and B) The financial performance of Trucco's operations after the upgrade of their systems to PLEXUS IMP in 2013.

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 30*)

Professor Westland responds to the Mr. Gottlieb's erroneous description of this generally-

accepted and scientific methodology as involving "supplementation" and doing a calculation

"twice", stating:

…rather it played an integral role in constructing pro forma financial statements from fragmentary financial and tax reports. What (Mr. Gottlieb) is purposely calling a second "unsupportable interpolation" is, in fact, the detrending of income statement accounts restate operations at a single price so that I could compare operations in two different time periods (pre-2013 and post-2013). Were I not to have done this, my damage valuations would have been nearly twice their current size. The detrending methods I used are fully described in <u>Technical Appendix B: Detrending data where I also provided the software code, and referenced source data for the calculations. My methods are fully supported</u>, and typical of those used elsewhere in finance, economics, epidemiology and other professions.

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 28*; Emphasis added)

12

Professor Westland also wrote in his rebuttal report that the later-produced documents of Defendants only served to support an increase the damages sustained by Plaintiffs in this case. He stated:

> More significantly, any adjustment to damage calculations to reflect actual financial numbers would increase the calculated monetary damages, because actual Sales, CGS and SGA in 2018-2019 are significantly larger than the 2018-2019 interpolations used in my report.

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 15*)

B.    Defendants Ignore That Professor Westland
Specifically Addresses "Major Variables"

Constituting the third and fourth grounds, and mistakenly relying upon The Gottlieb Rebuttal, Defendants argue that Professor Westland did not account for "major variables" and made simple calculation errors.  <u>Nothing could be further from the truth</u>.  Professor Westland extensively describes his generally-accepted process to address "Major Variables."  Professor Westland made sure that his data sources, statistical methods, and computer code used to assess damages are detailed in his initial report and its technical appendices.  The calculations were implemented in computer code that were included in full in the initial report, and can be replicated. Professor Westland's methods are generally-accepted and widely used for valuations and A/B testing in industry.

Professor Westland stated that he maintained statistical control over "major factors" that could influence the dependent "unjust enrichment" variables by: a) "consistently detrending financial figures, to control for inflation and Trucco's organic growth, where the detrending used industry best-practice time-series models" (*Doc. No. 82-4; Westland Rebuttal Report, pg. 32*); and b) "consistently testing for unobserved covariant predictors, through mixed-effects and other models where applicable." (*Id.*)  Professor Westland explained that:

> Specific interpretation and methodological choices in my curating, analysis and calculation involving Trucco's financial data have been motivated by
>
> - a choice of the most objective and least subjective methodology that will insulate data and analysis from investigator bias, while providing objective, verifiable and replicable conclusions; and
> - the elimination of effects due to confounding and unobserved variables; and
> - the choice of the most appropriate methods and prior assumptions that would allow Trucco's financial  data, and the analysis based upon that data, to speak for itself without imposing any investigator bias.
>
> (*Id.*)

Professor Westland met his obligations under <u>Daubert</u> from the inception of his engagement.  It is abundantly clear that Professor Westland's expert opinion is reliable and admissible. He stated:

> Every step in my analysis presents clear inferential pathways, created using econometric <u>'best-practices' documented in the appendices including </u> the generating software code and source documents, which clearly traces a path from damage calculation back to the underlying evidence. 1) Data for analysis was selected appropriately:  <u>Data was sufficient</u> in the documents made available to me by AJ Trucco from prior financial reports and tax returns, to compute actual loss and unjust enrichment using: (1) profits on sales, (2) cost efficiencies, and (3) business value. 2) The results of the analysis were generated using consistently followed methodology. <u>I consistently detrended data to remove extraneous influences of inflation and organic growth in Trucco's business. I controlled for unobserved covariant predictors, where this was necessary, through mixed-effects models."</u>
> (*Doc. No. 82-4; Westland Rebuttal Report, pg. 31;* Emphasis added)

Defendants' argument unscientifically suggests that Professor Westland should have considered the disputed and implausible role that Mr. Pacia (Defendants' owner) alleges to have played in the development of PLEXUS.  Defendants intend to argue that they own PLEXUS, based solely on Mr. Pacia's alleged contribution to development concepts, despite the bar to such a claim under the "Work for Hire" provisions of Copyright Law.  Plaintiffs will not devote time to this specious argument other than to note that Mr. Pacia's alleged contribution, and his alleged

experience and knowledge as a businessman, are irrelevant to this motion.

Defendants make a series of arguments about the profession of accounting and business valuation, all of which read like fodder for cross-examination instead of a good-faith basis to object to the admissibility of Professor Westland's expert opinions.  Indeed, no cogent argument is offered for the preclusion of Professor Westland as an expert.  It should be noted, however, that Mr. Gottlieb's ultimate opinion is that Professor Westland's damage opinion should have be $6 million of unjust enrichment of Defendants rather than $14 million, and Mr. Gottlieb offers no damages calculation methodology, and no opinion at all of the damages incurred by Plaintiffs.

Relying solely on Mr. Gottlieb, Defendants falsely claim that Professor Westland "does not indicate the standard of value used in his analysis" and affirmatively assert that "…(fair) market value as defined in Revenue Ruling 59-60." Professor Westland responds that "The valuation standard I use is the industry norm for going-concerns: value is the net present value of future free cash flows projected from information about the industry and prior performance of the firm" (*Doc. No. 82-4; Westland Rebuttal Report, pg. 9*).  In rejecting the Revue Ruling 59-60 standard, Professor Westland states "No one would ever use one of the IRS' Revenue Rulings as a basis for valuing a going-concern…" (*Doc. No. 82-4; Westland Rebuttal Report, pg. 9*).

Relying upon Mr. Gottlieb, Defendants claim that Professor Westland failed "…to consider the  three broad approaches to value: the asset, market, and income approaches" and claim that "The third and final component of the…damage calculation is the net present value of the increase in enterprise value in 2019."  Professor Westland responds:

> My valuation is a present value calculation of future free cash flows projected from information about the industry and prior performance of the firm.  There is only one way to perform a present value calculation on a time series: (formula given).

(*Id*.)

Professor Westland then adds:

> I certainly did consider asset, market, and income approaches in my opinion. The "Asset Approach" which is a "Not Going Concern" approach to valuation clearly doesn't apply to AJ Trucco which is a successful and ongoing firm. The "Market Approach" doesn't make sense, since Pacia owns 100% of AJ Trucco and those  shares don't trade. 'Income Approach' method requires the identification of a business with 'similar investment characteristics.' Again, Pacia owns 100% of AJ Trucco, doesn't publicly release financials and doesn't provide any information that could be used to identify a similar company. Valuation is particularly problematic in closely held firms, as the Owner-Manager of a small closely held company such as AJ Trucco typically accounts for around 35% of its valuation.

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 10*)

Professor Westland states that he did not use 'inflation' as Mr. Gottlieb claimed and further

stated:

> …inflation is a national statistic not specifically applicable to individual company analysis. US Inflation statistics are based on a 'standardized basket of goods' which is not reflective of AJ Trucco's product sales. In fact, what I did, was to detrend the time series of financial statement data so that I could compare financial performance before and after PLEXUS IMP installation at AJ Trucco. US inflation factors come from a basket of goods maintained by the Bureau of Labor Statistics, and cannot be used to accurately detrend a single business time-series.

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 27-28*)

Professor Westland concluded:

> The approach I used in my opinion clearly is a valid, yet conservative approach to calculating damages. <u>And it is based on 'best-practice' methodologies in finance and econometrics."</u>

(*Doc. No. 82-4; Westland Rebuttal Report, pg. 10*; Emphasis added)

The remainder of Defendants' argument that there are simple calculation errors in Professor Westland's initial report is based upon entirely on Mr. Gottlieb's analysis, which Professor Westland rebuts in his rebuttal report.  Mr. Gottlieb provides Tables 1 and 2, which appear to be created out of thin air and not based on any real analysis of Professor Westland's work.

C.    Defendants Ignore Professor Westland's
      <u>Credentials and Business Valuation Expertise</u>

Constituting the fifth ground, Defendants falsely claim that Professor Westland does not

have business valuation expertise. Defendants ignore the books and papers authored by Professor

Westland, including two books on valuation, both with 5-star ratings on Amazon: 1) <u>Valuing</u>

<u>Technology: The New Science of Wealth in the Knowledge Economy</u> (Wiley Finance Series),

(February 28, 2002), ISBN-10: 047082056X, and 2) <u>Financial Dynamics: A System for Valuing</u>

<u>Technology Companies</u> (Wiley Finance), (September 25, 2003), ISBN-10: 0470821116, which

was praised in a testimonial (on the book's cover) by Aswath Damodaran, the leading valuation

expert in the US and the author of 25 books and numerous academic papers on valuation, or

Professor Westland's authoritative book on data science in accounting: Audit Analytics: Data

Science for the Accounting Profession (Use R!), Springer (Nov. 21, 2020), ISBN-10: 3030490904

(rated 5-stars on Amazon).

Professor Westland is also a CPA in good standing.  He is active in accounting and

valuation.  Methods of linear interpolation and Bayesian A/B are industry standards for valuation

and generation of pro forma financial statements.  In addition to having authored two well-regarded

books on valuation, Professor Westland authored a book on data science in accounting, Audit

Analytics: Data Science for the Accounting Profession (Use R!) Springer (November 21, 2020),

ISBN-10: 3030490904 (also rated 5-stars on Amazon).

Defendants make false assertions about Professor Westland's credentials and professional

requirements.  They allege that "CPAs are also required via the 'AICPA Code of Professional

Ethics' and that "the Westland Report is subject to the Statement of Standards for Forensic

Services (SSFS No. 1) of the AICPA.  However, as Professor Westland points out, "...there is no

document titled 'AICPA Code of Professional Ethics.'" (*Doc. No. 82-4; Westland Rebuttal Report,*

*pg. 3*)   Professor Westland acknowledges that he is not an AICPA member (*Doc. No. 82-4;*

*Westland Rebuttal Report, pg. 7*).  However, Dr. Westland states in his Rebuttal Report:

> In the Rebuttal, (Mr. Gottlieb) fails to refer to me as a CPA in the first part
> of his report, and later uses the phrase "The author of the JCW Report
> represents himself as a CPA" to suggest that I may indeed not be a CPA.
> Since he can easily look up my status online (e.g., Illinois License
> 065.035982;                                  https://online-dfpr.micropact.
> com/Lookup/LicenseLookup.aspx) this is simply an attempt to insert
> confusion into discussions about my credentials (which are included in my
> vita attached to my report). I am not a member of the AICPA (and AICPA
> membership is not included in my vita) yet he conflates the issue by stating
> that: "CPAs who have joined the American Institute of Certified Public
> Accountants and provide services to clients as part of litigation or
> investigation engagements voluntarily submit to their ethics rules and
> professional practice standards." MSG uses a "credentials fallacy" to attack
> my arguments, but precedes that with claims that I actually don't possess
> the credentials that I actually do possess.

(*Id.*)

In fact, Professor Westland is "a currently active, Licensed Certified Public Accountant

(Illinois License 065.035982) and beholden to the standards and rules of conduct of the Illinois

CPA Society" (*Doc. No. 82-4; Westland Rebuttal Report, pgs. 5, 7*).

Defendants further allege that Professor Westland is subject to "Engagements for lost

profits and damage calculations for litigation or regulatory proceedings fall under SSFS No. 1."

which prevents AICPA members from rendering "fraud" opinions, or from receiving "contingent

fees". Professor Westland is not an AICPA member, nor has he rendering a "fraud" opinion, nor

is his fee contingent. Defendants opine that this matter is subject to IRS Revenue rulings

(specifically Revenue Ruling 59-60), which, as Professor Westland explains at page 8 of his

Rebuttal Report, is inapplicable, here, as this is not a tax case, nor is it before a Tax Court.

Defendants' attack on Professor Westland's credentials is a red-herring.  First, the

objection related to business valuation expertise is largely irrelevant to this case.  This case is not

about a business valuation.  The expert opinion at issue relates to the damages sustained by

Plaintiffs based upon the Defendants' unjust enrichment arising from their misappropriation of Trade Secrets. Defendants know that Professor Westland is a known and published expert in information sciences, Statistics, computer science, accounting and business valuation. Yet, they selected as an accountant, Mr. Gottlieb, as their rebuttal expert and chose also to have no other expert to defend this case. Defendants also made a deliberate decision to engage their expert whose sole purpose was to find fault with the work of Professor Westland without engaging in any technical or other analysis of his own on the issue of Plaintiffs' damages. Defendants wrongfully seek to shift the burden of proving how much of the damages were not derived by wrongful conduct. See Keurig, Inc. v. Sturm Foods, Inc., 2013 WL 633574, at *1 (D. Del. Feb. 19, 2013) affirmed, 732 F.3d 1370 (3d Cir., 2013) (the party defending against a claim "bears the burden of proving how much, if any, of its profits were not derived from its wrongful conduct").

## ARGUMENT

## PROFESSOR WESTLAND QUALIFIES AS AN EXPERT UNDER FRE 702

### A.    Legal Standard

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court explained that Federal Rules of Evidence ("FRE") 702 creates "a gatekeeping role for the [trial] judge" so that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. The expert testimony should "help the trier of fact to understand the evidence or to determine a fact in issue." FRE 702 (a).

A key, but sometimes forgotten principle of FRE 702 and Daubert, is that FRE 702, both before and after Daubert, was intended to relax traditional barriers to admission of expert opinion testimony. See, e.g., Daubert, 509 U.S. at 588. Accordingly, courts are in agreement that FRE 702 mandates a liberal standard for the admissibility of expert testimony. See Daubert, 509 U.S. at 588

(FRE 702 is part of "liberal thrust" of Federal Rules of Evidence); see generally 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[1] (2d Ed. 2005) (collecting cases). As the Advisory Committee to the 2000 amendments to FRE 702 noted with apparent approval, "(a) review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Cook v. Rockwell Int'l Corp., 580 F. Supp.2d 1071, 1083 (D. Colo. 2006). In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions. See Daubert, 509 U.S. at 595.

Nothing in Daubert or its progeny changed the fundamental rule that the factual basis of an expert opinion "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968 (8th Cir., 1995), Southland Sod Farms v. Stover Seed Co., 108 F. 3d 1134 (9th Cir., 1997) ("Technical unreliability goes to the weight accorded…not its admissibility..."); Kannankeril v. Terminix Int'l, Inc., 128 F. 3d 802 (3d Cir. 1997) (reversing exclusion of expert based on "insufficient factual foundation and cautioning that the "trial judge must be careful not to mistake credibility questions for admissibility questions."). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "Rule 702 and Daubert put their faith in an adversary system designed to expose flawed expertise." United States v. Mitchell, 365 F.3d 215, 244-45 (3d Cir. 2004) (citations omitted).

Expert testimony is admissible if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." FRE 702 (b)-(d), see Elcock v. Kmart Corp., 233 F.3d 734, 741-46 (3d Cir. 2000) (noting "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit"). "(T)he expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert).

Under FRE 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The factors relevant to determining reliability include "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015), but the inquiry is a "flexible one," Daubert and the "factors…do not constitute a 'definitive checklist or test.'" (citations omitted).

Under the Federal Rules of Evidence, testimony is relevant as long as it "has any tendency to make a fact more or less probable" than it would otherwise be. FRE 401. The evaluation of relevance for expert testimony under Daubert is a "liberal relevance standard." Stollings v. Ryobi

Techs, Inc., 725 F.3d 753, 768 (7th Cir., 2013). FRE 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." "Unless the Court orders otherwise, an expert may state an opinion –and give the reasons for it – without-out first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination. FRE 705.

In Clerveaux v. East Ramapo Central School District, 984 F.3d 213 (2d Cir., 2021), the Second Circuit affirmed the admissibility of expert opinion and the analysis of the four (4) factors set forth in Daubert. In Clerveaux, supra, the court rejected the defendant's primary argument was that the plaintiff had not turned over all the materials necessary to permit the defendant to replicate the analysis of the plaintiff's expert.

In this case, Defendants falsely assert that the "pro formas" were not turned over to them. The record shows, however, that Professor Westland identified, and turned over, all documents and data upon which he relied, and offered to provide other materials to Defendants upon their request, but there was no request. Defendants also did not claim that they tried, but were not able, to replicate Professor Westland's work. In light of the fact that Mr. Gottlieb does not have a background in Bayesian A/B Analysis or information science, such claims could not be made. Professor Westland turned over the pro forma data which were data points in his analysis. He made a comprehensive production to Defendants through his Dropbox just prior to his deposition and Defendants were satisfied. The Second Circuit in Clerveaux, just as the District Court did, rejected the argument by the defendant because, citing to the Record, "one of the (defendant's)

experts was able to get the script to run on the 2015 voter data but was never asked to complete the EI analysis." <u>Clerveaux</u>, *supra*, 984 F.3d at 226.

As to the second <u>Daubert</u> factor - whether the theory or technique has been subject to peer review - the Second Circuit agreed with the District Court that the methodology used had been peer reviewed. It cited to an article authored by scholars. Here, Defendants do not claim that Professor Westland's methodology has not been peer reviewed. Professor Westland is one of many expert who have written on the subject of the methodologies which he employed, which he describes as generally accepted, and which Defendants do not challenge.

With respect to the third <u>Daubert</u> factor - incidence of error - Professor Westland has gone to great lengths to disclose his many methods to avoid error and data bias of every kind. Once again, Defendants do not raise any objection as to incidence of error or specific steps to avoid error. In <u>Clerveaux</u>, *supra*, the Second Circuit affirmed the District Court's finding of "strong concordance" between "self-reported race and BISG estimates" whereas, here, there is strong concordance between the Dr. Westland's opinions in his initial report and the effect thereon of the belatedly produced financial data of Defendants. Professor Westland was able to confirm that his opinions were conservative and actually lower than they would have been had he had the missing financial reports. This confirms the reliability of Professor Westland's methodology.

With respect to the fourth factor -whether the methodology has been generally accepted by the academic or scientific community - the Second Circuit in <u>Clerveaux</u>, supra, noted that the District Court did not explicitly address the factor but discussed academic articles on the subject. <u>Clerveaux</u> 984 F.3d at 227 and also noted that the District Court found that these articles did not support Plaintiffs' methodology, but the found that the helpfulness of the articles goes to their weight of persuasiveness, not their admissibility ("The district court discussed academic articles

involving the use of BISG; the District argued these articles did not support Plaintiffs' use of BISG, but the district court found that the helpfulness of the articles goes to their weight of persuasiveness, not their admissibility.") Id.   Finally the Second Circuit noted that "(u)ltimately, the district court concluded that there "are indications of scientific reliability supporting the opinions' admissibility," and "Plaintiffs have made a sufficient showing that I should hear the testimony and give it whatever weight I find it deserves." (Id.)

      B.      <u>Application of the Legal Standard</u>

Professor Westland's reports reference the documents and data that he used.   Since the damages opinion is based on Defendants' own documents and data, Defendants have all of the financial documents and data, without exception.   The exact methodology by which Professor Westland established data points for missing data for the Bayesian methodology and the methodology, itself, are fully provided.   Professor Westland is qualified in all areas upon which he renders an opinion, and his opinions are based upon established scientific principles and well-documented in books and articles on the subject. His qualifications are by virtue of "knowledge, skill, experience, training, or education" FRE 702, but in this case, it is all of the above. This testimony will help the trier of fact to evaluate and assess damages in this case, "understand the evidence or to determine a fact in issue.  FRE 702.  Professor Westland's expert testimony is based on sufficient facts or data.  He specifically found the documents and data sufficient for his initial report, even though certain documents were missing and later provided.  Professor Westland's expert testimony is the product of "reliable principles and methods"  FRE 702 and he has "reliably applied the principles and methods to the facts of the case."  His great care to avoid error and data bias is well-documented.

Defendants engaged Mr. Gottlieb to attack Professor Westland, but not to perform an independent damages analysis.  Defendants did not claim that they tried, but were unable, to replicate Professor Westland's work.  Defendants do not claim that Professor Westland's methodology has not been peer reviewed.  Professor Westland is one of many experts who have written on the subject of the methodologies which he employed, which he describes as generally accepted, and which Defendants do not challenge.  Defendants do not raise any objection as to incidence of error or specific steps to avoid error.  Plaintiffs have established that Professor Westland's is an expert with probative evidence that will assist the jury.  The jury should be permitted hear the testimony of Professor Westland and give it the weight and consideration that they might believe it deserves.

<u>**CONCLUSION**</u>

Defendants' motion to exclude the expert testimony of J. Christopher Westland, PhD, CPA should be denied, together with such other and further relief as the Court deems just and proper.

Dated: Massapequa, New York
January 17, 2022

RUSS & RUSS, P.C.

By: *Jay Edmond Russ, Esq.*
Jay Edmond Russ, Esq.
Attorney for Plaintiffs
543 Broadway
Massapequa, New York 11758
(516) 541-1014
jayruss@russrusspc.com