**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    Case No.: 20-cv-00018-AT-SLC
-------------------------------------------------------------------------x
REDCELL CORP. and REDCELL SYSTEMS, LLC,

                              Plaintiffs,

             -against-

A. J. TRUCCO, INC. and TRUCCONOVA, LLC,

                              Defendants.

-------------------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE**
**IN WHOLE OR IN PART DEFENDANTS' EXPERT MARK S. GOTTLIEB, CPA**


RUSS & RUSS, P.C.
Attorney for Plaintiffs
Post Office Address:
543 Broadway
Massapequa, New York 11758
(516) 541-1014
jayruss@russrusspc.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................i-ii

PRELIMINARY STATEMENT ........................................................................................1

THE GOTTLIEB REBUTTAL REPORT ........................................................................1

MR. GOTTLIEB'S REPORT AND ANTICIPATED TESTIMONY ARE
NOT RELIABLE OR HELPFUL AND SHOULD BE STRICKEN ................................8

CONCLUSION ................................................................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

AstraZeneca LP v. Tap Pharm. Prods., Inc.,
    444 F. Supp.2d 278, 293 (D. Del., 2006)..............................................................13

Beaudette v. Louisville Ladder, Inc.,
    462 F.3d 22 (1st Cir., 2006) .........................................................................7, 8

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993)...................................................................................7, 17

Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.,
    285 F.3d 609 (7th Cir., 2002) ..........................................................................17

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999).......................................................................................17

Lee Valley Tools, Ltd., v. Indus. Blade Co.,
    288 F.R.D. 254 (W.D.N.Y., 2013)......................................................................17

Marvel Characters, Inc. v. Kirby,
    726 F.3d 119 (2d Cir., 2013)............................................................................18

Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,
    2010 WL 2978289 (D. Conn., 2010) ...................................................................8

McCullock v. H.B. Fuller, Co.,
    61 F.3d 1038 (2d Cir., 1995)............................................................................8

McGovern v. Brigham & Women's Hosp.,
    584 F. Supp.2d 418, 426 (D. Mass., 2008) ..........................................................18

Northern Heel Corp. v. Compo Indus.,
    851 F.2d 456 (1st Cir., 1988)...........................................................................13

Oxford Gene Tech. Ltd. v. Mergen Ltd.,
    345 F. Supp.2d 431 (D. Del., 2004)...................................................................13

Schneider ex rel. Estate of Schneider v. Fried,
    320 F.3d 396, 404 (3d Cir., 2003).....................................................................13

Packard v. City of New York,
    2020 WL 1479016 (S.D.N.Y., 2020)...............................................................8, 16

United Phosphorus v. Midland Fumigant,
    173 F.R.D. 675 (D. Kansas, 1997)...................................................................13

United States v. Grizaffi,
    471 F.2d 69, 74 (7th Cir., 1972) ...................................................................18

United States v. Hall,
    93 F.3d 1337, 1343 (7th Cir., 1996) ...............................................................13

Statutes and Federal Rules:                                    Page

FRE 403 .....................................................................................................17

FRE 702 ...................................................................................................7, 8

FRE 703 .....................................................................................................17

Other Authority                                                  Page

FRE 702 advisory 8 LIBA/1964097.2 committee's note ...........................................18

## PRELIMINARY STATEMENT

This Memorandum is submitted by Plaintiffs in support of its <u>Daubert</u> motion to exclude the testimony and report of Defendants' rebuttal expert, Mark S. Gottlieb, CPA ("Mr. Gottlieb"). Defendants moved to exclude the testimony of Plaintiffs' expert, J. Christopher Westland, PhD, CPA ("Professor Westland"), and Plaintiffs have opposed that motion.  Plaintiffs incorporate by reference their opposition to Defendants' motion, since both motions rely upon the same three (3) expert reports, facts, statutes, and case law.

## THE GOTTLIEB REBUTTAL REPORT

Plaintiffs challenge the anticipated testimony of Mr. Gottlieb and his rebuttal report ("the Gottlieb Report") which is annexed to Defendants' motion (Doc. No. 82-3).  Plaintiffs, in this Memorandum, identify certain provisions relevant to their motion.

Mr. Gottlieb was retained only to analyze the initial report of Professor Westland and for no other purpose:  "We have been retained by Defendants' counsel to analyze Plaintiffs' expert report, dated May 12, 2021" (Transmittal Letter attached to Gottlieb Report), "We have been retained by Ralph R. Smith 3rd Esq. of Capehart Scatchard, P.A. counsel for the Defendants, to independently review the May 12, 2021 expert report prepared by J. Christopher Westland…" (Gottlieb Report, pg. 7), and "Our engagement's objective is to express an independent opinion about the reasonable certainty of the economic losses alleged within the JCW Report and whether such damages are supported by the procedures that were deemed relevant and valid" (Gottlieb Report, pg. 9).

Mr. Gottlieb's opinion and core conclusion is that the Professor Westland's initial report (Doc. No. 82-2) <u>overstated</u> the damages sustained by Plaintiffs: "Based upon the principles and procedures described herein, we find that the opinions, calculations, and conclusions of J.

Christopher Westland, Ph.D., CPA, significantly overstate the possible damages sustained by the Plaintiffs." (Transmittal Letter to Gottlieb Report).

Mr. Gottlieb also calculates the alleged <u>overstatement</u> of damages in Professor Westland's initial report. Mr. Gottlieb's conclusion is that the damages actually sustained by Plaintiffs in this case (in one of several categories of damages) are $6 million, rather than $13 million. Mr. Gottlieb displays his conclusion in the chart, which is reproduced below.

"<u>The following table illustrates the overstatement of damages given JCW's intended determination</u>."

|  | As Reported | As Intended | Difference |
|---|---|---|---|
| Excess Profit on Sales | $ 684,489 | $ 701,249 | $ (16,760) |
| Savings From Cost Efficiencies | 12,287,400 | 5,350,833 | 6,936,567 |
|  | $ 12,971,889 | $ 6,052,082 | $ 6,919,807 |
|  |  |  |  |

(Gottlieb Report, pg. 18)

Mr. Gottlieb concluded that Professor Westland's initial report was flawed, but not because of the data sources used by Professor Westland:

> Setting aside that the initial financial information used was not obtained from Defendants' actual books and records and was completed by (Professor Westland's) discretion, (Professor Westland) supplemented this information with unsupportable interpolations not once, but twice, to prepare the posterior Bayesian means, distributions for free cash flow, and distributions for costs. The arbitrary selection of financial data to complete the financial Pro-forma and then, the random use of data points to manipulate the bell curves, is nothing more than a smokescreen to disguise an unobservable outcome.

(Gottlieb Report, pg. 13).

Mr. Gottlieb ignored the history of Defendants' late document and data production. He completely discounted the fact that Professor Westland had to rely on the documents and data then

available to him to meet his deadline in this case, and that he submitted his rebuttal report after receiving the balance of the documents and data, pursuant to the Court's June 10, 2021 Order (Doc. No. 82-4).[1]  The Court should further note that Mr. Gottlieb ignores the fact that the documents and data eventually provided by Defendants pursuant to the Court's June 10, 2021 Order (Doc. No. 63), were consistent with the Professor Westland's initial report, as clearly set forth in Professor Westland's rebuttal report and as testified to by Professor Westland at deposition.  In fact, the damages reported by Professor Westland in his initial report were conservative and would have been higher had he had the later-produced data.

Mr. Gottlieb also assembled information for his Rebuttal Report from interviews with Defendants' employees ("…we spoke with Nicola Pacia, Sasha LoPresti, Vince Ivanov, the Defendants' counsel…; Gottlieb Report, pg. 9).  However, the transcripts of the interviews – or even Mr. Gottlieb's notes from those interviews – were not produced by Defendants or attached to his Rebuttal Report.  This is discussed at pages 8-13 of this Memorandum, below.

Mr. Gottlieb states that Professor Westland's initial report employed "…a Bayesian A/B test…to compare the two time periods, 2008-2013 and 2014-2019" (Id.).  However, Mr. Gottlieb failed to disclose in his report that he knows absolutely nothing about Bayesian A/B testing, which he admitted at deposition (See Exhibit "A" to Russ Decl, Transcript ["Tr.] of Gottlieb Deposition pg. 33 l. 10-15).  Mr. Gottlieb also failed to disclose in his report that his entire "analysis" of the Bayesian A/B testing was performed by some other person in Mr. Gottlieb's office, whose data, research, and conclusions and opinions Mr. Gottlieb simply adopted as his own.  This is discussed at pages 14-16 of this Memorandum, below.

---

[1] This is discussed by Plaintiffs at Page 5 of their Memorandum of Law in opposition to Defendants' motion to strike Professor Westland's expert report and testimony.

Mr. Gottlieb's Rebuttal Report contains an Appendix that lists seven (7) categories of documents. However, Item 6 is the Defendants' confidential Mediation Statement in this case. Mr. Gottlieb testified at deposition as to his use of other information and materials, none of which is referenced or cited in the Appendix.

Mr. Gottlieb is not a computer or software expert; yet he offered up a gratuitous and conclusory analysis of Plaintiffs' PLEXUS software, its use and purpose:

> Simply stated, the Redcell software keeps track of the flow of the imported inventory at the New Jersey facility. This business segment is referred to as the "retail" business because it serves as a wholesale and distribution center for large retailers. After establishing the New Jersey warehouse, it maintains the pertinent documents and tracks the inventory's receipt, disbursement, and stored location. In addition, it monitors sales and purchase orders, creates product labels, and tracks materials needed such as trays and shrink wrap for the products "re-packaging" and "re-styling" required by its customers. The software also keeps track of accounts receivable and accounts payable. The software's purpose is not to maintain or provide sufficient financial data to create income statements, balance sheets, tax returns, or any other comprehensive financial reports to illustrate the business' results of the operations or financial condition.

(Gottlieb Report, pg. 14).

What is the source of this simplistic analysis? Only his interviews with Defendants.

Mr. Gottlieb, in his report, also offers up lengthy, but unscientific and inexpert opinions for the reasons for Trucco's growth and success. For example, at pages 14-15 of the Gottlieb Report, he states in a conclusory manner that:

1) "(T)the primary reason for the Company's sales growth is due to Mr. Nicola Pacia's business and management acumen and effort."

2) "The following is a condensed list of the direct reasons for Trucco's growth:

> 1. Mr. Pacia hired two salesmen (Vito Cangiacosi and Tony Biondo) to service the wholesale distribution business. Messers. Cangiacosi and Biondo frequently visit customers to plan product requirements. Additional administrative personnel was also hired to handle the additional anticipated paperwork.

4

2.  In 2015, Mr. Pacia became a 100% owner of A.J. Trucco and redirected the business' attention. In particular, making the distinction between the wholesale sales to small local resellers and those sales to large "big box" retailers.

3. Additional space was acquired in the Hunt Point Market for additional product capacity and variety.

4. In 2018, Trucco, Inc was organized to operate a 70,000 square foot distribution warehouse to service large retailers. This facility was managed by two managers (Craig Matinger and Thomas Latzkowsky). Immediately thereafter, they were able to eliminate co-packers and shipping services. This expansion also allowed a more diversified product line.

5. A significant effort was also made to re-brand and market the Company and its products.

3)      "(T)hese efforts were facilitated at the direction of Mr. Pacia."

4)      The modest improvement in Trucco's gross profit margins of 8.9% in 2014 and to 10.3% in 2019 "is directly related to the change in freight costs, custom brokers fees, and storage costs – all of which have no bearing on the Redcell software."

(Gottlieb Report, pgs. 14-15).

Mr. Gottlieb also expressed an opinion that portions of Professor Westland's report were "improbable": "Again, this simple historical data analysis refutes the initial and long-term growth benchmarks asserted by (Professor Westland) confirms his calculations of excess profits on sales and savings from cost efficiencies are improbable" (Gottlieb Report pg. 16).   The word "improbable" is unclear and misleading.

Mr. Gottlieb expressed an opinion that Professor Westland's damages calculation might have been "materially lower."   Mr. Gottlieb speculates that "(i)nstead of applying the average inflation factors over the Pro-Forma period, (Professor Westland) applied the average of the profit on sales, cost savings, and free cash flow for the years 2016 to 2018. As can be observed from the following table, if (Professor Westland) would have used the intended averages his calculation of

damages would have been materially lower" (Gottlieb Report pg. 17).  The words "materially lower" are unclear, misleading, and unnecessary given the chart.

Mr. Gottlieb expressed an opinion that "(Professor Westland's) damage calculation of "net present value of the increase in enterprise value in 2019" is "poorly conceived and is determined without merit." (Gottlieb Report, pg. 18)  The phrase "poorly conceived" is both unclear and misleading.

Mr. Gottlieb expressed an opinion as to the sufficiency and quality of Professor Westland's credentials in business valuation – even though Mr. Gottlieb is not an expert in business valuation credentialling, or in issues involving professional standing.  In fact, Mr. Gottlieb falsely concluded that "(Professor Westland) has no credentials in business valuation, nor does his curriculum vitae demonstrate any expertise in this subject matter." (Id.)  Mr. Gottlieb's conclusion is replete with "buzzwords"; but these buzzwords have no clear or precise meaning ("if the bell curves were deemed correct, the pairwise hypothesis testing of the data before and after 2013 does not prove a nexus between the use of the Redcell software and the subject business's operations and/or financial condition.") (Gottlieb Report pg. 20).  These words are unclear and misleading.

Mr. Gottlieb is not qualified to rebut Professor Westland because Professor Westland and he come from different fields.  Each has a vastly different education, training, knowledge, experience, and expertise.  Professor Westland, Plaintiffs' expert, is renown in the fields of information science, statistics, computer science and accounting.  Mr. Gottlieb, on the other hand is a CPA whose apparent expertise is in the field of forensic accounting, even though this case does not involve the need for a forensic accountant.  Professor Westland has a PhD in Computers & Information Systems, an MBA in Accounting, and a BA Mathematics.  He is a full-fledged professor on the faculty of University of Illinois-Chicago.  He has published authoritative books,

software and publications, all of which are set forth in his extensive Curriculum Vitae. On top of that, Professor Westland is a CPA, like Mr. Gottlieb.

Mr. Gottlieb's engagement was purposefully limited to a critique of the work of Professor Westland. Mr. Gottlieb was not engaged to perform any independent analysis, or to test Professor Westland's conclusions by means of replicating Professor Westland's work. Mr. Gottlieb was not engaged to provide a report or offer testimony on any liability issue; nor was he engaged to present an alternative methodology of damages ascertainment, or even to calculate Plaintiffs' damages.

As a result, Mr. Gottlieb's Rebuttal Report and his testimony is probative only to rebut Professor Westland's conclusions <u>from a purely accountancy perspective</u>. However, Mr. Gottlieb's Rebuttal Report does not disclose or point to any alleged insufficiencies in Professor Westland's expert report relating to accountancy, and Mr. Gottlieb does not present himself as an accounting expert in valuation of trade secrets, such as source code and software or damages occasioned by misappropriation.

To permit Defendants to introduce Mr. Gottlieb's report and testimony, this Court must review his qualifications to determine if Mr. Gottlieb actually satisfies the requirements for expertise and reliability established under Rule 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592 (1993). See <u>Beaudette v. Louisville Ladder, Inc.</u>, 462 F.3d 22, 25-26 (1st Cir., 2006) (reviewing the standard for expert admissibility under Rule 702 and <u>Daubert</u>). While Rule 702 allows a qualified witness to testify in the form of an opinion at trial if the "scientific, technical, or other specialized knowledge will assist the trier of fact," before being permitted to do so, a proffered expert must first establish that his qualifications and methodology provide the basis for reliable opinions. <u>Mr. Gottlieb has failed to do so here</u>. The Court must ensure that a proffered expert witness is properly qualified as to the specific areas for which he expects to offer an opinion.

See Beaudette, 462 F.3d at 25-26.  The Court must also determine if Mr. Gottlieb has specialized knowledge that will "assist the trier of fact to understand the evidence or to determine a fact in issue." FRE 702.

Plaintiffs recognize that "disputes as to the strength of (an expert's) credentials, fault in his…methodology, or lack of textual authority for his opinions, go to weight, not the admissibility of his testimony." Packard v. City of New York, 2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020), citing McCullock v. H.B. Fuller, Co., 61 F.3d 1038 (2d Cir., 1995).  However, this case presents a more urgent case for exclusion of a rebuttal expert.  Here, as is demonstrated below, in addition to many other infirmities, Defendants rely on the conclusions of a non-testifying and non-disclosed "secret expert," who allegedly performed work on Mr. Gottlieb's behalf.  Mr. Gottlieb did not perform any of the analysis.  The report is not his; he just parrots what he was told.

## MR. GOTTLIEB'S REPORT AND ANTICIPATED TESTIMONY ARE NOT RELIABLE OR HELPFUL AND SHOULD BE STRICKEN

Mr. Gottlieb's testimony should be excluded as not helpful to the jury and potentially misleading.  Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, 2010 WL 2978289, at *6 (D. Conn. Apr. 9, 2010).  We cite from Mr. Gottlieb's deposition testimony (Exhibit "1" to Russ Decl.) as to his heavy reliance on oral statements and interviews with various people, and his note taking – which was discarded and not produced:

> Q. **Now turn to page 9 of your report, please, the second paragraph. And the language I want to ask you about is, quote, We spoke with Nicola Pacia, Sasha LoPresti, Vince Ivanov, the defendants' counsel.**
>
> MR. RUSS: Does the court reporter need spellings? Okay. Let's go back. Nicola, N-I-C-O-L-A, Pacia P-A-C-I-A. Sasha is obvious. LoPresti, with a capital P in the middle, R-E-S-T-I. Vince Ivanov, I-V-A-N-O-V. And then I said defendants' counsel.
>
> Q. So let's starts with that word, "We." Do you know what the word "We" references?

A. I use we in my report because I try to be all inclusive. But in this instance, I was the person in the firm that interviewed the defendants. So in this instance, we means Mark Gottlieb.

Q. Okay, thank you. So did you interview all of these people on the same day, or on different days?

**A. I interviewed them on several instances, on several different days, both together and separately.**

Q. Okay. And sitting here today, do you have a recollection of those, or would you need some notes or materials to be able to answer questions about those interviews?

A. **Well, I don't have any notes in reference to those interviews.** What I generally do is I speak with the client to get an understanding of, of the matter. They have already completed the business valuation and litigation questionnaire. And as I go through the questionnaire and I go through the preparation of my report, I sit on the phone with them and I type from the – our conversations, the information that I'm trying to elicit from my interviews to incorporate into the report. **I don't prepare separate memos, or notations, or notes in connection with those interviews.**

(Gottlieb Tr. Pg 15 line 19 to pg. 17 line 12)(Emphasis added)

*          *          *

Q. So let's turn to Sasha LoPresti. Do you know what her relationship is, if anyone, with Nicola Pacia?

A. I believe she's a stepdaughter.

Q. And do you know professionally what her education and skills are?

A. I don't recall what her formal education is, but she appears to be very familiar with the operations of the business. And based upon my conversations with her, she seems to be the right-hand person to the owner.

Q. Did you determine that she was a law school graduate?

A. I don't recall that, sir.

Q. Okay. And were you ever told that she practiced law?

A. No, not that I recall.

Q. Okay. So let me ask you the same question about her that I asked you about Mr. Ivanov. Do you have a recollection as to what questions you posed of her and what answers you received from her in connection with your work?

A. Yes. She was very helpful in assisting me to develop a basic understanding of the three entities that the plaintiff owns and that information –

Q. That the defendant owns.

A. That the defendant owns, excuse me. And that information that she provided is provided in my report on pages 10, 11 and 12.

Q. Any other information from Sasha LoPresti?

A. She also provided an understanding of what the -- how the RedCell software is    being applied. That was basically the issues that we had discussed.

Q. What did Sasha LoPresti tell you with specific reference to RedCell software?

A. If you give me a moment, I identified it in my report. So let me refer to my report for this. **So she provided the information that allowed me to prepare the paragraph on page 14 of my report that starts, "Simply stated."**

Q. And is the information in that paragraph completely from her?

A. I would say so, yes, sir.

Q. And did she provide any information to you other than that which is contained in this paragraph on page 14 that starts with the words, "Simply stated"?

A. So if we were to start from the beginning of the report under the caption "Subject Information," the paragraph, "Subject Information."

Q. What page are you on?

A. Page 3, sir.

Q. Okay. I'm following with you.

A. **So for several pages, on pages 3 through page 6, Ms. LoPresti assisted in determining, or I obtained from her the information that is presented here. And I know you don't want me to complete your sentence, but it actually is a combination of her stepfather and herself that helped me get this information. I know you're not asking me about him yet, but that's what this information came from, or who it came from.**

Q. I appreciate that. That's helpful, thank you. Okay, let's go back to page 14, with the paragraph that begins with the words, "Simply stated." You said earlier that you contacted these people while you were typing the report, and you would interview them, I'm going to use the word live, quote, live, close quote, and use the information you received and typed it into the report.

Is that what you did with regard to your interview of Sasha LoPresti for the paragraph on page 14?

A. Yes. I may have -- **I may have made some handwritten notes, like sketch notes, because some of the information she gave me was not in the order. But you know, I don't keep those notes, and I just immediately transfer those notes from handwritten notes into the report.** I'm -- one of the purposes of my job, I'm the report writer in the firm, and so I have a definite style in preparing the report. And after I have obtained an initial understanding of what my objective is and what information was available to me, I have a pretty familiar fashion to prepare my report. So it's very easy for me to ask questions, ask supplemental questions from the answers from the business valuation litigation questionnaire and whatever follow-up questions I have. So maybe that's more of an answer than you really required, I apologize, but the answer is essentially this is, I was writing and/or typing as I was speaking to her.

Q. That's what I understood your testimony to be. So would you agree with me that the paragraph on page 14 that begins with the word "simply stated" are essentially verbatim of what Sasha LoPresti was saying to you on the telephone while you were typing?

A. Yes.

Q. Okay. **Let's turn to the Nicola Pacia. What questions did you ask of him, and what responses did you get?**

A. Well, he was the individual that answered, I believe, the initial business valuation questionnaire. I had, for the most part, in developing my narrative in the report, I spoke to him in conjunction with Ms. LoPresti. He was, **he was very -- he was very helpful in identifying some of the other**

11

**employees and business activities that led to, that he believes led to the growth of the business over, over the last several years**.

Q. Are there sections of the report that were prepared essentially the same way as the paragraph the Sasha LoPresti was providing to you? In other words, are there sections of this report that are verbatim from your interview of Nicola Pacia?

A. At the end of page 14, he was – he was -- he was the individual that told me about him hiring the additional salespeople. He also gave me an understanding of how the, how he acquired the business, you know, how he had an existing business previously from the previous two owners and he contributed his business to the Trucco, the initial Trucco entity that was just selling fruits and nuts. He also -- he gave me the information -- yeah, that was primarily it –

Q. Okay –

A. -- how he acquired the 25 percent, or when he acquired the 25 percent.

Q. So would it be fair to say that the information you received from Nicola Pacia was basically in two areas, number one, historical as to the development of the, of his ownership of the company, and also information about how he staffed with employees?

MR. MESSINA: Objection to form. You can answer.

A. In part. That wasn't exclusively what he had provided, but certainly that was an integral part of our conversation.

Q. What did I forget to raise? I don't want to make a mistake in asking the wrong question. What is the other area that you questioned Nicola Pacia about and received answers?

A. He also contributed to the understanding and confirmed a lot of the things that Sasha had said, Ms. LoPresti had said to me.

Q. Okay.

A. **And again, it was really a collaborative effort when the three of us were speaking, and often they would speak, not over each other but simultaneously, and saying essentially the same thing. And then at times when there was something that was more historic to be provided, Nicola would provide that information because, obviously, he's been in the business all of these years**.

Q. So you conducted the interview of Nicola Pacia and Sasha LoPresti together, the three of you.

A. **We had several interviews, several phone calls, and yes, I more often than not would speak to them together, yes**.
(Gottlieb Tr. Pg 19 line 19 to pg. 27 line 7)(Emphasis added)

Mr. Gottlieb's opinions are nothing more than regurgitations of Defendants' allegations, masquerading as undisputed fact. As such, they are not "evidence" but rather are meant to put forth inadmissible non-expert conclusions. See Northern Heel Corp. v. Compo Indus., 851 F.2d 456, 468–69 (1st Cir., 1988). Mr. Gottlieb accepts as a gospel truth Defendants' self-serving statements as to the alleged contributions of Mr. Pacia to Plaintiffs' PLEXUS software. This places Mr. Gottlieb squarely in the middle of the factual disputes, where he does not belong. See United Phosphorus v. Midland Fumigant 173 F.R.D. 675 (D. Kansas, 1997) in which the Court, agreed with the plaintiff and held that held that it was "not acceptable methodology" for the defendant's economist to rely upon the deposition testimony of an interested party "where objective evidence and analysis exists." The Court should bar Mr. Gottlieb from simply repeating Defendants' version of the disputed facts as to the state of mind of Defendants' principals and employees, such as Mr. Pacia. AstraZeneca LP v. Tap Pharm. Prods., Inc., 444 F. Supp.2d 278, 293 (D. Del. 2006) (Expert witnesses are not "permitted to testify ... regarding (the defendant's) intent, motive, or state of mind, or evidence by which such state of mind may be inferred" citing Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp.2d 431, 443 (D. Del., 2004). An expert opinion must be based on "methods and procedures of science" rather than "subjective belief or unsupported speculation." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir., 2003). "Unless the expertise adds something, the expert is at best, offering a gratuitous opinion, and at worst is exerting undue influence on the jury…" United States v. Hall, 93 F.3d

1337, 1343 (7th Cir., 1996). Mr. Gottlieb's rebuttal opinions are not the result of reliable principles and methods. Mr. Gottlieb does not reliably apply principles and methods to this case.

Mr. Gottlieb's opinions also lack a scientific method because his opinions cannot be tested. Under <u>Daubert,</u> the first listed factor is whether the expert's technique or theory can be or has been tested. That is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability. Gottlieb's report fails this test. Gottlieb has no scientific basis to challenge Professor Westland, and merely resorts to subjective factors.

We now turn to Mr. Gottlieb's critique of Professor Westland's use of Bayesian A/B testing. <u>Until this case, Mr. Gottlieb never heard of Bayesian A/B testing.</u> Critically, he is not the author of the section of the Gottlieb Report that critique's Professor Westland's reliance on Bayesian A/B analysis. Mr. Gottlieb's deposition makes that clear:

> Q. Are you familiar with something called Bayesian, B-A-Y-E-S-I-A-N, capital A, slash, capital B testing?
>
> A. Yes, I am now.
>
> Q. You are now. Were you before today?
>
> A. Before today, yes, before today, yes.
>
> Q. So when you say now, do you mean before this engagement?
>
> A. Correct.
>
> Q. Okay. So let's go back before this engagement. **Before this engagement, were you familiar with Bayesian A/B testing?**
>
> **A. No.**
>
> **Q. Had you never heard of it?**
>
> **A. I'm not a statistician, and I had no reason to know it.**

Q. Had you or anyone in your organization at any time conducted any Bayesian A/B testing?

**A. David Pratt in my office, who is more of a finance person than a forensic accountant valuation person, he is familiar with it.**

Q. So when did you determine that David Pratt in your organization was familiar with Bayesian A/B testing?

A. Well, that's more his background, so I would assume he would know it.

Q. What I'm asking is: When you received my expert's report, did you have some communication with David Pratt by which you discussed whether he did or didn't have knowledge of Bayesian A/B testing?

A. I made a copy of the report. I said, David, you read this, I'm going to read it, and we will talk about it tomorrow.

Q. And I think you already told me that you do not have written materials from any work that David Pratt has done for this report or this engagement; is that correct?

A. Other than what's included in the report.

Q. Right, I understand that. There is no, there is no separate materials from David Pratt, correct.

    Do you know if David Pratt conducted any Bayesian A/B testing on this matter?

A. One of the things that he did was he actually utilized the pro forma financial statements that appeared on the JCW report to try to reconstruct what the results were presented in the JCW report, and based upon that analysis, we were able to determine that it had an error.

Q. And that's what you reported in the table that we just looked at that says "as reported" and "as intended," correct?

A. Correct.

Q. So to some degree that table represents the work of David Pratt; is that correct?

A. Yes, sir.

**Q. Is that table completely the work of David Pratt?**

**A. On page 18?**

15

**Q. Correct.**
**A. Well, that's just -- that Table 18 is a summary of what David had computed.**

Q. Right. And what I'm asking you is: Is there some person other than David Pratt who contributed to what is reported on the table on page 18?

A. No.

Q. Did you, yourself, draw any conclusions or express any opinions with regard to any matter in my expert's report that is based upon Bayesian A/B testing?

MR. MESSINA: Objection to form. If you understand what he's asking for, you may answer.

A. Yeah, I apologize, Jay, I don't really understand. Maybe you could rephrase it for me.

Q. I'd be happy to. Maybe it was too convoluted. You told me earlier, Mr. Gottlieb, that you are the source of the opinions for this report, correct?

A. Correct.

Q. Did you -- do you have any opinion, did you report any opinions of your own work, of you, on Bayesian A/B testing?

MR. MESSINA: Objection to form. You can answer.

MR. RUSS: Let me try again. I don't want to confuse you. I see you struggling.

**Q. Do you have any opinions about the Bayesian A/B testing that has been conducted**
**in this case?**

**A. My opinions are based upon what I've been told from the work performed by**
**David in my office**.

Q. Thank you.
(Gottlieb Tr. Pg 33 line 22 to pg. 38 line 4)(Emphasis added)

Mr. Gottlieb's so-called "rebuttal" of Bayesian A/B testing should be stricken.  In Packard

v. City of New York, supra, this Court stated:

> For all expert witnesses, a party must disclose "the identity of [the]
> witness." Fed. R. Civ. P. 26(a)(2)(A). For expert witnesses retained by a
> party for the purpose of providing expert testimony the disclosure "must be
> accompanied by a written report[ ] prepared and signed by the witness"
> containing several categories of information. Fed. R. Civ. P. 26(a)(2)(B).
> Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to ... identify
> a witness as required by Rule 26(a) or (e), the party is not allowed to use
> that ... witness to supply evidence on a motion, at a hearing, or at a trial,
> unless the failure was substantially justified or is harmless." Fed. R. Civ. P.
> 37(c)(1).

2020 WL 1479016, at *2

The Gottlieb Report should be excluded because it is merely the conduit for the opinion of

a non-testifying expert. Dura Auto. Sys. Of Ind., Inc. v. CTS Corp., 285 F.3d 609 (7th Cir., 2002),

Lee Valley Tools, Ltd., v. Indus. Blade Co., 288 F.R.D. 254 (W.D.N.Y., 2013).  While FRE 703

allows an expert to base an opinion on facts or data that the expert has been made aware of or

observed personally, if experts in the field would reasonably rely thereon, the expert opinion of a

subordinate of Mr. Gottlieb does not qualify.  It is merely the expert opinion of someone else who

is not a testifying expert in the case, and has not been designated as an expert.  FRE 403 also

excludes evidence if probative value is outweighed by danger of unfair prejudice, confusion of the

issues or misleading the jury.  Here, Mr. Gottlieb admitted that he does not possess the expertise

with regard to the core opinions of Professor Westland and the Bayesian analysis, and also

admitted that he merely uncritically adopted the opinion of someone else, and does not understand

that opinion.

Even if Mr. Gottlieb had the requisite training, education, or experience, the Gottlieb

Report is devoid of any disclosure of the reliable "methodology" which undercuts Mr. Gottlieb's

conclusions.  In Daubert, the Supreme Court held that determining the admissibility of expert

scientific testimony "entails an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts." 595 U.S. at 592–93. The Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999) clarified that this assessment of the expert's underlying reasoning and methods applies to all experts. Mr. Gottlieb reached all of his conclusions by relying upon his experience as an accountant, but little else. He offers unsubstantiated conclusions about the state of Defendants' business and the actions and intent of its owner. Mr. Gottlieb offers no methodology by which the Court and jury can determine whether his expected testimony is the product of reliable principles and methods, or even that he has reliably applied those principles and methods to the facts of the case.

Although an expert may testify solely on the basis of his experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FRE 702 advisory 8 LIBA/1964097.2 committee's note, Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 135-36 (2d Cir., 2013), see also McGovern v. Brigham & Women's Hosp., 584 F. Supp.2d 418, 426 (D. Mass. 2008). Mr. Gottlieb does not explain how his experience as an accountant leads him to any of the conclusions he reaches. To the extent that Mr. Gottlieb asserts that Professor Westland made an arithmetic error, which Professor Westland disputes, that is not proper rebuttal expert testimony. See United States v. Grizaffi, 471 F.2d 69, 74 (7th Cir., 1972) (affirming exclusion of accounting expert who simply made arithmetical computations based on data provided by counsel where such information was within the competence of the jurors).

## CONCLUSION

Plaintiffs' motion striking the expert testimony of Mark S. Gottlieb, CPA, in whole or in part, should be granted, together with such other and further relief as the Court deems just and proper.

Dated: Massapequa, New York
      January 17, 2022

                            Respectfully Submitted,

                            RUSS & RUSS, P.C.

                            By: *Jay Edmond Russ, Esq.*
                                Jay Edmond Russ, Esq.
                            Attorneys for Plaintiffs
                            543 Broadway
                            Massapequa, NY 11758
                            (516) 541-1014
                            jayruss@russrusspc.com