UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REDCELL CORP. and REDCELL SYSTEMS, LLC,<br><br>        Plaintiffs,<br><br>    -v-<br><br>A. J. TRUCCO, INC. and TRUCCONOVA, LLC,<br><br>        Defendants. | CIVIL ACTION NO.: 20 Civ. 0018 (AT) (SLC)<br><br>**OPINION AND ORDER** |

**SARAH L. CAVE**, United States Magistrate Judge.

## I.INTRODUCTION

In this action involving claims by Plaintiffs Redcell Corp. and Redcell Systems, LLC (together, "Redcell") against Defendants A.J. Trucco, Inc. and Trucconova, LLC (together, "Trucco"), under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA") and for breach of contract, before the Court are the parties' motions to exclude each other's experts pursuant to Federal Rule of Evidence 702. (ECF Nos. 82 ("Trucco's Motion")); 87 ("Redcell's Motion"; together, the "Motions")). For the reasons set forth below, Trucco's Motion is GRANTED IN PART and DENIED IN PART, and Redcell's Motion is GRANTED IN PART and DENIED IN PART .

## II.BACKGROUND

### A.  Factual Background

The factual background to Redcell's claims is set forth in the Court's Report and Recommendation dated July 20, 2021 (ECF No. 65 (the "R&R")), and the Order of the Honorable Analisa Torres dated March 8, 2022, denying Trucco's motion for leave to file counterclaims against Redcell.  Redcell Corp. v. A.J. Trucco, Inc., No. 20 Civ. 18 (AT) (SLC), 2022 WL 683007

(S.D.N.Y. Mar. 8, 2022).  The Court incorporates that factual background, and summarizes the facts necessary for analysis of the Motions.

### 1.  **The Parties' Relationship**

Trucco imports and distributes produce in interstate and foreign commerce, and Redcell is a technology company that develops computer software and provides IT services.  Redcell, 2022 WL 683007, at *1.  "From 2008 to 2019, Redcell provided Trucco with software development, IT support maintenance, and logistics services."  Id.  During that period, "Redcell and Trucco collaborated on the development of the 'IMP software system.'"  Id.  One of the software products was "PLEXUS IMP," which was "'designed for management of a produce importer" and "controlled the business processes at every Trucco location.'"  (R&R, ECF No. 65 at 3 (quoting ECF No. 8 ¶¶ 17, 33)).

In 2008, the parties entered into a software development agreement (the "SDA"), which provided that Redcell owned the copyrights to the code to the IMP software until Trucco made its final payment to Redcell, at which time Redcell would transfer the copyrights to Trucco. Redcell, 2022 WL 683007, at *1.  The parties also entered into a series of enterprise service agreements, each of which contained a three-year non-solicitation clause prohibiting Trucco from recruiting, soliciting, or hiring any of Redcell's employees.  (R&R, ECF No. 65 at 6–7).

Trucco paid Redcell pursuant to the SDA, but the parties disputed ownership of the copyrights to the IMP software.  Redcell, 2022 WL 683007, at *1.  The parties' relationship ended in February 2019 when, Redcell alleges, Trucco induced Redcell's chief software programmer, Jean Paul Arce ("Arce"), to stop working for Redcell and affiliate with Trucco, taking with him Redcell's source code for the IMP software.  (R&R, ECF No. 65 at 2–3).

Redcell alleges that Trucco's poaching of Arce enabled Trucco to gain access to and exploit the source code for the IMP software as the "base of an enhanced system."  (R&R, ECF No. 65 at 9 (quoting ECF No. 8 ¶ 76)).  Redcell asserts two claims, for misappropriation of trade secrets in violation of the DTSA, and for breach of contract, and seeks damages for Trucco's unjust enrichment in an amount equal "to the entire value and profitability of Trucco's business[,]" as well as punitive damages, attorneys' fees, and costs.  (ECF No. 8 ¶¶ 79–81, 83–97).

### 2.  The Westland Report

Redcell's damages expert, J. Christopher Westland ("Westland"), has been a professor in the Information & Decision Sciences Department at the University of Illinois – Chicago since 2007. (ECF No. 83-2 at 2).  He received his B.A. in mathematics and his M.B.A. in accounting from Indiana University, and his Ph.D. in computers and information systems from the University of Michigan.  (Id.)  He is a certified public accountant licensed in Illinois.  (Id.)  His background includes several assistant and adjunct professor positions in accounting, computers, and information systems at universities in the United States and China.  (Id.)  He is the editor-in-chief of "Electronic Commerce Research," and has been an associate editor on numerous journals relating to information systems, telecommunications systems, and electronic commerce.  (Id. at 2–3).  Westland has authored or co-authored eleven books, including "Financial Auditing with Information Technology," "Financial Dynamics: A System for Valuing Technology Companies," and "Valuing Technology: The New Science of Wealth in the Knowledge Economy."  (Id. at 3).  He has 80 refereed publications, and has published in several trade publications.  (Id. at 3–7). Westland professes familiarity with thirteen computer languages.  (Id. at 6).

Westland issued two reports on Redcell's damages, an initial report dated May 12, 2021 (the "Westland Report"), and a rebuttal report dated July 22, 2021 (the "Westland Rebuttal Report," with the Westland Report, the "Westland Reports")).  (ECF Nos. 82-2; 82-4).  In the Westland Report, Westland opined that Redcell's damages for unjust enrichment under the DTSA, based on Trucco's misappropriation of the PLEXUS IMP software in 2019, totaled $14,596,902, comprised of Trucco's $684,489 in excess profits on sales, $12,287,400 in savings from cost efficiencies, and a $1,625,013 increase in enterprise value ("EV").  (ECF No. 82-2 at 2).  Westland explained that Trucco's excess profits on sales represented "net sales revenues less costs that directly vary with sales (are directly attributable to sales)[,]" which he calculated using "Trucco's reported net sales less their reported cost of goods sold."  (Id. at 8).  Westland described "[r]esearch and development benefits" that Trucco incurred "from the PLEXUS IMP licensing and implementation," as to which he performed "a conservative and completely objective assessment[.]"  (Id.)  He computed cost efficiencies "from the total of costs of goods sold plus selling, general and administrative costs."  (Id.)  He computed EV:

> using the industry best-practice net present value (NPV) of free cash flows approach.  Free cash flows were computed as net sales, less cost of goods sold, selling general and administrative expenses and shareholder distributions. Trucco's cost of borrowed capital was used as the discount rate for the NPV.

(Id.)  Westland explained that he employed the following steps to analyze Trucco's accounts and operations before and after the licensing of the PLEXUS IMP software:

> 1. Extraction of financial information from discovery documents, internal reports and external web scraping.  This data was curated into a set of financial statements spanning the years 2008 through 2019.
>
> 2. The curated financial statements dataset contained periods and accounts with missing data.  I used industry best-practice methods for both cross-sectional and time-series methods to interpolate missing data . . . .

3. All financial data was de-trended, to remove the impact of appreciating dollar amounts due to inflation and business growth from 2007 through 2019. Without de-trending, business value and profits on sales after the installation of PLEXUS IMP would be dramatically overstated, because the later numbers are substantially larger than earlier numbers. De-trending of data eliminates this problem and states all periods in the equivalent of 2013 (midpoint) dollars.

4. Industry best practice Bayesian A/B tests were performed of the years PLEXUS IMP was installed (B) versus the years it was not (A) . . . .

5. The value added to trucco's business with the licensing and installation of the PLEXUS IMP software is the difference in posterior Bayesian means under scenario (A) versus scenario (B) . . . .

(Id. at 9).[1]

Westland's ultimate opinion was that "Trucco's benefit from increased profits on sales, cost savings in operations, and increased enterprise value rationally flows from the licensing and implementation of PLEXUS IMP and the other evidence presented." (ECF No. 82-2 at 11). Annexed to the Westland Report are technical appendices setting forth how Westland interpolated missing financial data, detrended data, applied Bayesian A/B testing, calculated enterprise value, and calculated unjust enrichment data, along with a list of his engagements over the past four years and documents he reviewed. (Id. at 12–56).

---

[1] Westland's reference to "Bayesian A/B tests" refers to Bayes' theorem about conditional probabilities, i.e., "the probability that an event A occurs given that another event B has already occurred is equal to the probability that the event B occurs given that A has already occurred multiplied by the probability of the occurrence of event A and divided by the probability of the occurrence of event B." Bayes' theorem, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/bayes theorem (last visited Aug. 25, 2022). Courts have recognized the use of Bayes' theorem in legal decision-making. See United States v. Shonubi, 895 F. Supp. 460, 485 (E.D.N.Y. 1995) (Weinstein, J.) (noting that "'Bayes' Theorem . . . is practically universally accepted as valid'") (quoting State v. Spann, 130 N.J. 484, 505 (1993)), rev'd on other grounds, 103 F.3d 1085 (2d Cir. 1997); see also Anderson News, L.L.C. v. Am. Media, Inc., No. 09 Civ. 2227 (PAC), 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015) (excluding expert's opinion that proposed an equation based on Bayes' theorem to prove antitrust claim); Rhodes v. Cracker Barrel Old Country Store, Inc., No. 4:99-CV-217-HLM, 2002 WL 32058462, at *33 (N.D. Ga. Dec. 31, 2002) (discussing expert's use of Bayes' theorem to calculate whether differences in the selection rates of African-American employees for certain positions were significantly correlated to race).

On August 17, 2021, Trucco's counsel deposed Westland.  (ECF No. 82-5).  During his deposition, Westland testified that he computed the inflation factors for Trucco's profit from sales, free cash flow, and cost efficiencies using "the inflation number for the retail fruit industry," which he took from a book written by Aswath Damodaran, "the valuation guru in this industry[.]" (Id. at 22).  He acknowledged receiving, after he completed his Report, additional financial statements and tax returns for Trucco, as to which he conducted "some simple analysis that indicated that the change would probably not be more than about 10 percent."  (Id. at 32–33). He testified that "it's likely that if there were a change in [his] damage valuations, they would actually be a little bit higher, just simply because Trucco has done very well in the past couple of years."  (Id. at 33).  He conceded that, having received the additional information, "the appropriate thing probably to do would be to do the extra analysis and use the full set of financial statements," but that he had not "perform[ed] a full analysis" and was "guessing the damages might be a little bit higher under the actual numbers."  (Id.)

### 3.  The Gottlieb Report

In rebuttal to the Westland Report, Trucco submitted the report of Mark S. Gottlieb, CPA ("Gottlieb"), the founder of Mark S. Gottlieb, CPA, PC ("MSG"), dated July 13, 2021.  (ECF No. 88-2 (the "Gottlieb Report")).  Gottlieb received a Bachelor of Business Administration degree in accounting from Adelphi University, and a Master of Science degree in taxation from Long Island University.  (Id. at 31).  He is a certified public accountant in New York and Connecticut, is accredited in business valuation and as a senior appraiser, and is certified in financial forensics, valuation analysis, and as a business appraiser.  (Id.)  He currently holds a faculty position at Fordham University School of Law, and previously held positions at New York Law School,

European School of Economics, and Pace University.  (Id.)  He is a member of the American Institute of Certified Public Accountants, New York State Society of Certified Public Accountants, American Society of Appraisers, National Association of Certified Valuation Analysts, and the Institute of Business Appraisers.  (Id.)  His summary of speaking engagements includes, over the last two decades, presentations on business valuations, forensic accounting, appraisals, and taxation.  (Id. at 32–33).  His blog publications, on MSG's website, cover similar topics.  (Id. at 33–35).  Gottlieb also lists more than 20 "publication contributions" in Crain's New York Business, the Associated Press, and Newsday, among others, on forensic accounting and taxation issues. (Id. at 36).

Gottlieb describes his assignment as "to independently review" the Westland Report and "express an independent opinion about the reasonable certainty of economic losses alleged within the [Westland] Report and whether such damages are supported by the procedures that were deemed relevant and valid." (ECF No. 88-2 at 13, 15).  To accomplish this objective, Gottlieb spoke with Trucco personnel (Nicola Pacia, Sasha LoPresti, and Vince Ivanov), Trucco's counsel, analyzed the Westland Report, "researched the trends in the applicable industry and economic indicators," and reviewed "documents that have been produced in this litigation, public records, and other sources considered informed and reliable."  (Id. at 15).  He prepared his Report with the assistance of other MSG personnel.  (Id. at 13).

After summarizing the history of Trucco's business, (ECF No. 88-2 at 16–18), Gottlieb describes what he perceives as five errors in the Westland Report: (i) Westland's reliance on "self-prepared pro-forma financial statements"; (ii) Westland's reliance on "unsupportable interpolations . . . to prepare the posterior Bayesian means, distributions for free cash flow, and

distributions for costs"; (iii) Westland's failure to provide the "detail or analyses" underlying his computations; (iv) Westland's lack of "credentials in business valuation"; and (v) Westland's failure "to consider any of the required factors dictated by the Internal Revenue Service or the generally accepted methodologies of the valuation profession." (Id. at 19–25). Gottlieb opines, "within reasonable certainty, that the alleged economic losses opined by [Westland] fail[] to provide a valid and supportable computation of damages sustained by [Redcell]." (ECF No. 88-2 at 26). Assuming that Westland used the correct approach to computing damages, Gottlieb asserts that Westland made a computational error: "Instead of applying the average inflation factors over the Pro-Forma period, he applied the average of the profit on sales, cost savings, and free cash flow for the years 2016 to 2018[,]" resulting in inflated damages estimates. (Id. at 23). Correcting for this error, Gottlieb found that Westland under-calculated Trucco's excess profit on sales by $16,760.00, and over-calculated Trucco's savings from cost efficiencies by $6,936,567.00, resulting in Westland's over-estimation of damages by $6,919,807.00. (ECF No. 88-2 at 23–24). In other words, Gottlieb asserts that, had Westland performed the correct calculations, the combined excess profits on sales and savings from cost efficiencies would have been $6,052,082.00, not $12,971,889.00, and his total estimated damages reduced accordingly, i.e., to $7,677,095.00.[2] (Compare ECF No. 88-2 at 24 with ECF No. 82-2 at 2).

Also on August 17, 2021, Redcell's counsel deposed Gottlieb. (ECF No. 88-1 ("Gottlieb's Testimony")). Gottlieb testified that he prepared his Report and developed the opinions he set forth, but that some of his staff "did part of the financial analysis" and "computations" of

---

[2] The sum of: Excess profits on sales of $701,249.00 + Savings from cost efficiencies of $5,350,833.00 + Increases in 2019 EV of $1,625,013.00.

"financial issues." (Id. at 11–12).   During his interviews of Pacia, LoPresti, and Ivanov, Gottlieb typed from their conversations "the information that [he was] trying to elicit from [the] interviews to incorporate into the report[,]" but did not prepare separate memos or notes of the interviews.  (Id. at 18).  He testified that the documents on which he relied for his opinions were those listed in the "document inventory" attached to his Report and those listed in the Westland Report.  (Id. at 29).  The "public records" to which he referred were the Federal Rules of Evidence and AICPA publications.  (Id. at 30).  Gottlieb conceded that he was not familiar with Bayesian A/B testing before this matter, but, with the assistance of a colleague, David Pratt, he determined that Westland had made an error in his calculations.  (Id. at 35–39).[3]

### 4.  The Westland Rebuttal Report

In his Rebuttal Report, Westland responds to each of Gottlieb's critiques and faults Gottlieb for failing to provide "an alternative interpretation and damages calculation[.]" (ECF No. 82-4 at 9).

As to Gottlieb's first and second criticisms relating to Westland's creation of pro forma financial statements and use of interpolations to calculate Trucco's cash flow and costs, Westland responds that Redcell "repeatedly asked for complete financial and tax documents during discovery, but these requests were denied except for a few years that Trucco somehow overlooked, despite all the financial information being readily made available to [Gottlieb]."  (ECF No. 82-4 at 5).  As a result, Westland states that he "used the standard 'best-practice' interpolation plus detrending . . . applying the same statistical methodologies that the Bureau of

---

[3] "Q. Do you have any opinions about the Bayesian A/B testing that has been conducted in this case?  A. My opinions are based upon what I've been told from the work performed by David in my office."  (ECF No. 88-1 at 38–39).

Labor Statistics uses, to build the <u>Pro Forma</u> financial statements that were, for the key values used in computing damages, generally within 10% of the actual financial figures [Gottlieb] displayed in his exhibits." (<u>Id.</u>; <u>see</u> <u>id.</u> at 16 (noting that his "estimates were generally within 10% of th[e] actual number" such that "the final damages" were affected "by less than 10%"); <u>id.</u> at 29 (asserting that his "interpolations are generally within 10% of the actual values" on Trucco's books and records)).  Westland also clarifies that he applied the Bayesian A/B methodology "to compute pre-and-post 2013 posterior distributions of detrended data[,]" a methodology he asserts "has now widely supplanted event studies in marketing, law, economics and other social sciences and is well established, with easily interpretable estimators (e.g. means)." (<u>Id.</u> at 5).  He explains that, in his Bayesian A/B methodology, A was "[t]he financial performance of Trucco's operations before the upgrade of their systems to PLEXUS IMP in 2013[,]" and B was "[t]he financial performance of Trucco's operations after the upgrade of their systems to PLEXUS IMP in 2013." (<u>Id.</u> at 31).

As to Gottlieb's third accusation, that Westland failed to provide the backup for his calculations, Westland accuses Gottlieb of "mis-copying" his calculations and ignoring the data sources and methods set forth in Technical Appendices A, B, and C to the Westland Report.  (<u>Id.</u> at 13–14; <u>see</u> ECF No. 82-2 at 12–43).  He re-lists the documents he reviewed, and asserts that an interview of Pacia was not necessary because he had Pacia's deposition transcript. (ECF No. 82-4 at 28; <u>see</u> ECF No. 82-2 at 51–52).  He also notes that in Technical Appendix B, he provided his detrending methods as well as the software code and source data.  (ECF No. 82-4 at 29; <u>see</u> ECF No. 82-2 at 14–15).

Fourth, as to his credentials, Westland cites two books he has written on valuation, Valuing Technology: The New Science of Wealth in the Knowledge Economy (2002), and Financial Dynamics: A System for Valuing Technology Companies (2003), and one book he has written on data science in accounting, Audit Analytics: Data Science for the Accounting Profession (2020). (ECF No. 82-4 at 4).  Westland reiterates his Illinois CPA licensure, and disputes that he has failed to comply with any ethical standards or harbors any conflict of interest.  (Id. at 4–6).

Fifth, in response to Gottlieb's criticism that Westland should have used IRS or other valuation methods, Westland responds that the valuation standard he used "is the industry norm for going-concerns: value is the net present value of future free cash flows projected from information about the industry and prior performance of the firm[,]" whereas "[n]o one would ever use one of the IRS' Revenue Rulings as a basis for valuing a going-concern."  (ECF No. 82-4 at 10).  He also notes that he did consider asset, market, and income approaches to valuation, but deemed them inapplicable to Trucco, and instead used "a valid, yet conservative approach to calculating damages." (Id. at 10–11).  He summarized this "conservative" approach as including the following steps: (i) projection of free cash flow ten (10) years into the future; (ii) use of growth multipliers from detrending calculations; (iii) projection of future cash flows for computation of NPV; (iv) use of a 5.3% discount rate, i.e., Trucco's cost of capital; (v) conservative assumption of zero contribution from steady-state operations over ten (10) years; and (vi) cross-verification of NPV and EV "using traditional best-practices EBITDA multiplier values."  (Id. at 11–12).[4]

---

[4] Westland also included a lengthy discussion of the basis for his belief that "PLEXUS IMP is a very good Software System," including several pages he excerpts from Pacia's deposition and a discussion of the benefits Trucco received after implementing PLEXUS IMP, none of which, the Court finds, sheds light on Westland's damages calculations or Gottlieb's criticisms.  (ECF No. 82-4 at 17–27).

B. **Procedural History**

Redcell filed this action on January 3, 2020 (ECF No. 1), and the operative Complaint on January 6, 2020.  (ECF No. 8).  On February 14, 2020, Trucco filed its Answer.  (ECF No. 24).  Following an initial pretrial conference on April 1, 2020, the Honorable Analisa Torres entered a civil case management plan and scheduling order setting January 15, 2021 as the deadline for fact discovery.  (ECF No. 34 ¶ 5).  The fact discovery deadline was extended to February 15, 2021, and again to April 19, 2021.  (ECF Nos. 36, 43).

In its July 3, 2020 responses to Trucco's document requests, Redcell disclosed a "Joint Database [that] arose from the business relationship between [the parties] whereby documents, communications and electronic data were generated/created daily because of [Redcell's] active operation of portions of [Trucco's] business."  (ECF No. 60 at 8).  Included in the Joint Database were "Cloud Storage and Back up," an "RDS Server" that contained Trucco's accounting system, an "SQL Server" used for the IMP software, and a "Web Server" and "SBS Server" that backed-up Trucco's servers.  (Id. at 8–9).  Redcell stated that Trucco had removed Redcell's access to the Joint Database, and Trucco had "sole and exclusive access" to it.  (Id. at 8).  On April 5, 2021, the parties entered a Confidentiality Stipulation and Protective Order that gave confidential treatment to, among other materials, the Joint Database.  (ECF No. 49).

Fact discovery closed on April 19, 2021 (ECF No. 43), but, following a conference on May 13, 2021 (the day after the Westland Report), the Court ordered Trucco to produce tax returns for 2018 and 2019, and if they existed, for years 2020 and 2021, or, in the alternative, existing financial statements.  (ECF No. 54).  After Trucco failed to do so, on June 10, 2021, the Court again ordered Trucco to produce tax returns for 2018, 2019, and, if they existed, 2020 and

2021, or, in the alternative, "existing financial statements reflecting their annual revenue for the relevant time period." (ECF No. 63 at 1). The Court also extended the deadlines for the exchange of expert reports and the deadline to complete expert discovery to August 18, 2021. (Id.)

On July 20, 2021, the Court issued the R&R recommending that Trucco's motion for leave to file counterclaims be denied. (ECF No. 65). On March 8, 2022, Judge Torres adopted the R&R in part, and denied Trucco's motion to file counterclaims. Redcell, 2022 WL 683007, at *1, *9. (See ECF No. 92).

Pursuant to a briefing schedule adopted by the Court, Trucco's Motion was filed on December 20, 2021, and Redcell's Motion was filed on January 18, 2022, and then refiled due to a clerical error on February 8, 2022. (ECF Nos. 82; 85; 87). On February 22, 2022 and March 9, 2022 respectively, Trucco and Redcell filed replies. (ECF Nos. 91; 93).

## III. DISCUSSION

### A. Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides, in relevant part, that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"District courts are the gatekeepers of expert testimony, responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Fin'l

Guar. Ins. Co. v. Putnam Adv. Co., No. 12 Civ. 7372 (AT), 2020 WL 4251229, at *2 (S.D.N.Y. Feb. 19, 2020) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)).  "The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

The Court must first address "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." Nimely v. City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702)). "Courts within the Second Circuit have 'liberally construed expert qualification requirements.'" In re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) (quoting In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., No. 00 MD 1358 (SAS), 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008) (quotation marks omitted)). "Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." Id.; see In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

The Court must then determine "whether the expert testimony is reliable." Fin'l Guar. Ins., 2020 WL 4251229, at *2.  Courts in this District evaluating an expert's reliability consider several factors "includ[ing] the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling

14

the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (quoting Daubert, 509 U.S. at 593–94). "Rule 702 also requires a sufficiently rigorous analytical connection between the expert's methodology and conclusions." Mirena, 169 F. Supp. 3d at 412. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). Underlying Rule 702's reliability requirement is the expert's obligation to disclose "the facts or data [he] considered . . . in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). Ultimately, "the test of reliability is flexible," and the Court has "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999) (quotation marks omitted).

Finally, after determining that an expert is qualified and reliable, the Court must ask "whether the expert's testimony (as to a particular matter) will assist the trier of fact." Nimely, 414 F.3d at 397 (citations omitted); see Fed. R. Evid. 702. While expert testimony may be persuasive, it "is still admissible if it is relevant and helpful." Mirena, 169 F. Supp. 3d at 413. On the other hand, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it[,]" United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), does not "aid the jury in making a decision" but instead "undertakes to tell the jury what result to reach" and, thus, improperly "attempts to substitute the expert's judgment for the jury's." United States v. Duncan, 42 F.3d

97, 101 (2d Cir. 1994) (emphasis omitted); <u>see</u> <u>Mirena</u>, 169 F. Supp. 3d at 413 (quoting <u>Bilzerian</u> and <u>Duncan</u>).

After applying this analysis, the Court may exclude all, or portions, of an expert's report or testimony.  <u>See</u>, <u>e.g.</u>, <u>Anderson News</u>, 2015 WL 5003528, at *4 (excluding portions of expert's opinions but admitting others).  "[B]ecause the federal rules emphasize liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions."  <u>United States v. Jakobetz</u>, 955 F.2d 786, 797 (2d Cir. 1992) (citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  <u>Daubert</u>, 509 U.S. at 596.

**B.  <u>Trucco's Motion to Exclude Westland</u>**

Trucco argues that Westland's Reports and testimony should be excluded for five reasons: (i) Westland failed to produce data on which he relied; (ii) he based his opinions on "self-manufactured and inaccurate financial data"; (iii) he relied on inaccurate calculations; (iv) he failed to account for major variables; and (v) he is not qualified to opine on business valuation issues.  (ECF No. 82-1 at 16–30).  The Court analyzes Trucco's arguments, in the context of the <u>Daubert</u> standard set forth above.

**1.  <u>Westland's Data</u>**

Taking Trucco's first two arguments together, Trucco criticizes Westland for basing his opinions on "self-manufactured financial data," specifically, the "'pro-forma' financial statements" that Westland created "without reviewing Trucco's actual financial statements or

income tax returns." (ECF No. 82-1 at 16). Trucco complains that Westland's failure to produce the pro-forma reports on which he relied violates Rule 26(a)(2)(B)(ii), and asks the Court to preclude Redcell from relying on Westland's opinions based on the undisclosed pro-forma financial statements under Federal Rule of Civil Procedure 37(c)(1).[5] (Id. at 16–17). Trucco also rebukes Westland for failing to conduct "a full analysis" based on the financial statements attached to the Gottlieb Report, information that shows, Trucco contends, that Redcell's damages were overstated "by as much at $6,919,807[.]" (ECF No. 82-1 at 19–20).

Redcell responds that the data on which Westland relies came from the Joint Database, "to which all parties had access prior to the commencement of the action, and which was disclosed by [Redcell] at the outset of this case." (ECF No. 84 at 6). Redcell notes that Westland "went to great lengths to explain his generally-accepted and good faith process, which was initially hampered by [Trucco's] failure to comply with their discovery obligations and produce their financial documents in a timely manner." (Id. at 9). Redcell points out that the pro-forma financial statements Westland created appear in Technical Appendix A to the Westland Report, the restatement to constant dollars (or detrending) appears in Technical Appendix B, the Bayesian A/B testing appears in Technical Appendix C, and the documents on which Westland relied, including the documents on which he relied "to reconstruct [Trucco's] financial statements," appear in Technical Appendix H. (Id. at 10). Redcell adds that Westland "personally provided [Trucco's] counsel with the documents and data requested via a Google link and responded to his queries." (Id. at 14). Even after reviewing Trucco's supplemental financial

---

[5] This Rule precludes a party who fails to disclose information required by Rule 26(a) from "us[ing] that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P 37(c)(1).

information, Redcell notes that Westland concluded that his "'original damage estimates are conservative and understated.'"  (Id. at 15 (quoting ECF No. 82-4 at 2)).

     The Court construes Trucco's arguments based on the data Westland used as a challenge to the second Daubert factor, the reliability of Westland's opinions.  First, the Court rejects Trucco's argument that Westland's opinions should be stricken based on a supposed failure to produce the data on which he relied.  Trucco acknowledges that at least some of the information on which Westland relies derives from the Joint Database, to which the Court has previously found that both Trucco and Redcell had access.  (See R&R, ECF No. 65 at 10-11 (noting that, as of April 7, 2021, Redcell continued to have access to the Joint Database)).  Trucco does not dispute that it has access to the Joint Database, and in fact has affirmatively alleged that the Joint Database contains documents "'relating to its financials and . . . sensitive economic data and forecasts and information relating to Trucco's profits and losses.'"  Redcell, 2022 WL 683007, at *2 (quoting ECF No. 57-3 ¶ 24)).  Further, Westland has provided not only the pro-forma financial statements that he prepared, (see ECF Nos. 82-2 at 12–13; 84 at 10), he also explained the methodology he used to prepare them, and responded directly to Trucco's counsel's queries with supporting documents and data.  (ECF Nos. 83-8; 83-9).  Thus, contrary to its claims, Trucco has "the underlying pro forma data" (ECF No. 82-1 at 18) as well as Westland's methodology for preparing the pro-forma financial statements in order to test their reliability.  (ECF No. 82-2 at 9-10, 12–13).  The fact that Gottlieb discerned computational errors in Westland's calculation of excess profits from sales and savings from cost efficiencies (ECF No. 82-1 at 22) undermines Trucco's assertion that Westland failed to provide sufficient data or methodologies to permit Gottlieb to test the reliability of his opinions.

Second, Trucco's criticism of Westland for not performing a "full analysis" once he belatedly received Trucco's actual financial statements also does not provide a basis for excluding Westland's opinions.  (ECF No. 82-1 at 19–20).  Westland testified at his deposition that, after receiving Trucco's actual financial statements, he performed a "simple analysis that indicated that the change would probably not be more than about 10 percent" and if anything, would increase, not decrease, his estimate of Redcell's damages.  (ECF No. 82-5 at 32–33).  The Court finds that precluding Westland's opinions because he performed a "simple" rather than a "full" analysis using belatedly-disclosed information would unfairly allow Trucco to benefit from its own failure to fulfill its discovery obligations in a timely manner and, thus, would run contrary to the purpose of Rule 37 sanctions.  Cf. Loc. 3621, EMS Officers Union, DD-37, AFSCME, AFL-CIO v. City of New York, No. 18 Civ. 4476 (LJL) (SLC), 2021 WL 134566, at *3 (S.D.N.Y. Jan. 14, 2021) (noting that "[t]he purpose of disciplinary sanctions under Rule 37 is . . . to 'ensure that a party will not benefit from its own failure to comply'" with its discovery obligations) (quoting S. New Eng. Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010)).  In addition, given Trucco's admission that it did not produce its actual financial statements until after the date of the Westland Report, (ECF No. 82-1 at 19 ("After Westland's Report was served, Trucco served to Redcell a document production containing copies of its actual financial statements")), Trucco's reliance on cases where courts have excluded the opinions of experts who had, but failed to consider, data available to them at the time they prepared their reports, is misplaced.  See Faulkner v. Arista Records LLC, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) (excluding opinion of expert who admitted "that he had failed to review all of the documents produced by [defendant] in the course of preparing his expert report"); Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp.

2d 169, 182 (S.D.N.Y. 2006) (excluding expert's opinion because performance data existed and was available to the expert at the time she prepared her report).  (See ECF No. 82-1 at 20–21).

Accordingly, Westland's preparation of and reliance on pro forma financial statements is not grounds to exclude his opinions.

### 2.  Calculation Accuracies and Inputs

Combining Trucco's third and fourth arguments, Trucco argues that Westland's opinions should be excluded due to his computational errors and failure to account for "major variables that could have changed his calculations."  (ECF No. 82-1 at 22, 25).  Specifically, Trucco contends that, in generating an average of inflation multipliers for each category of damages—profit from sales, free cash flow, and cost efficiencies—Westland "mistakenly averaged the annual figures for the three categories for each year[,]" instead of averaging each category across the ten-year period.  (ECF No. 82-1 at 22–24 (emphasis removed)).  When Gottlieb re-performed Westland's calculations with the correct average inflation multipliers, Westland's damages estimate for excess profit on sales and cost efficiencies (two of the three categories of damages) decreased from $12,971,889 to $6,052,082, a difference of $6,919,807.  (ECF Nos. 82-1 at 25; 88-2 at 23–24).  Trucco also contends that Westland failed "to capture or even account for or explain the business and management acumen and efforts of Trucco's owner, Pacia[.]"  (ECF No. 82-1 at 26).

Redcell responds that Westland addressed and "maintained statistical control over 'major factors' that could influence the dependent 'unjust enrichment' variables by: a) 'consistently detrending financial figures, to control for inflation and Trucco's organic growth . . . and b) 'consistently testing for unobserved covariant predictors, through mixed-effects and other models where applicable.'"  (ECF No. 84 at 17 (quoting ECF No. 82-4 at 32)).  Redcell also points

to Westland's discussion, in his Rebuttal Report, as to why the asset, market, and income approaches that Trucco invokes are inapplicable, and why Gottlieb's analysis of any "simple calculation errors" is flawed.  (Id. at 19–20; see ECF No. 82-4 at 10–11, 13–14).  Redcell adds that any "alleged contribution" that Pacia made to the development of the PLEXUS IMP software is "irrelevant" to whether Westland's opinions should be excluded.  (ECF No. 84 at 18–19).

The Court finds that neither Westland's computational errors nor his choice of variables warrants exclusion of his opinions.  Although it is unclear from the Westland Rebuttal Report whether Westland agrees with Gottlieb's conclusion that he (Westland) incorrectly used the average of profit from sales, free cash flow, and cost efficiencies for each year, instead of the average of each of those categories across the ten-year period, that is the "kind[] of mistake[] in arithmetic [that] can be corrected (unlike the mistake of using an unreliable methodology) and [] present[s] questions of weight and not admissibility."  Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 657 (S.D.N.Y. 2007) (finding that expert's mathematical errors were not ground to exclude his opinions).  And if Westland's averaging was correct, i.e., he and Gottlieb arrive at different conclusions using the same set of Trucco financial information, it "'merely creates[] a credibility question for the jury to resolve'" and is not a basis for excluding Westland's opinions. Rand v. Volvo Fin'l N. Am., Inc., No. 04-CV-349 (DLI) (KAM), 2007 WL 1351751, at *3 (E.D.N.Y. May 8, 2007) (quoting Holbrook v. Jamesway Corp., 172 A.d.2d 910, 911 (3d Dep't 1991)); see also United States v. Morgan, 53 F. Supp. 3d 732, 741 (S.D.N.Y. 2014) (explaining that, "under Daubert, the possibility that a different conclusion could be drawn from [] data does not undercut the reliability of the conclusion that was drawn, as long as the expert has good grounds for the chosen interpretation") (quotation marks omitted); Guild v. Gen'l Motors Corp., 53 F. Supp. 2d

363, 369 (W.D.N.Y. 1999) ("[T]he mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable.  Such differences of opinion and alleged weaknesses in the experts' methodologies will go to the weight to be given the expert testimony, not its admissibility.").  Here, Westland has met the "good grounds" standard by setting forth the sources of his data and the methodology he employed; whether his or Gottlieb's calculations using that data is correct "is precisely the type of disagreement that the flexible thrust of <u>Daubert</u> entrusts the jury to decide."  <u>Morgan</u>, 53 F. Supp. 3d at 742; <u>see also</u> <u>In re Fosamax Prods. Liab.</u> <u>Litig.</u>, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) ("If an expert's testimony lies within the range where experts might reasonably differ," then the trier of fact should "decide among the conflicting views of different experts.") (citation omitted).

As to Trucco's argument that Westland failed to account for major variables, the only such variable to which Trucco points is "the business and management acumen and efforts of Trucco's owner, Pacia[.]"  (ECF No. 82-1 at 26).  Trucco offers no explanation as to how such "acumen and efforts" are quantifiable, but, in any event, has failed to persuade the Court that, to the extent Westland may have failed to consider Pacia's role, Westland's "methodological choices were so unsound or flawed as to render his analysis fundamentally unreliable."  <u>United States v. Am. Exp.</u> <u>Co.</u>, No. 10-CV-4496 (NGG) (RER), 2014 WL 2879811, at *4 (E.D.N.Y. June 24, 2014).  Further, Westland <u>did</u> take into account inflation as well as "Trucco's organic growth," <u>i.e.</u>, the extent to which Trucco's business grew independent of the PLEXUS IMP software, by "consistently detrending financial figures" using "industry best-practices time-series models[.]"  (ECF No. 82-4 at 33).  Any argument that Westland did not place enough weight on Pacia's alleged contributions in relation to other factors "go[es] to the probative weight of [Westland's opinions] and not their

admissibility under Rule 702." Am. Exp., 2014 WL 2879811, at *5; see In re Elec. Books Antitrust Litig., No. 11 MD 2293 (DLC), 2014 WL 1282293, at *25 (S.D.N.Y. Mar. 28, 2014) ("'A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method' does not itself require exclusion . . . .") (quoting Amorgianos, 303 F.3d at 267).  And arguments as to the weight Westland's opinions should receive is "more appropriately explored through '[v]igorous cross-examination' and the 'presentation of contrary evidence,' rather than through the severe remedy of exclusion." Am. Exp., 2014 WL 2879811, at *5 (quoting Daubert, 509 U.S. at 596).

The Court does find, however, that to the extent Westland (and Gottlieb, as discussed below), provides arguments in support of the significance to Trucco's business growth of the PLEXUS IMP software and against Pacia's "business acumen," he is improperly offering a factual narrative that is inappropriate for an expert opining on damages, and that portion of his Rebuttal Report shall be excluded.  See Fosamax, 645 F. Supp. 2d at 192 (excluding portion of expert's report that offered "a narrative history of Fosamax"); Highland Cap. Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."); Taylor v. Evans, No. 94 Civ. 8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (excluding portions of expert report that consisted of "a narrative of the case which a lay juror is equally capable of constructing"); In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (excluding portion of expert report presenting history of Rezulin for no purpose but to "provid[e] an historical commentary of what happened").  Accordingly, the Court excludes the portion of the Westland Rebuttal Report from the heading "PLEXUS IMP is a very good Software System" through and including the section with the heading "Nicola Pacia is correct; a modern business

can't survive without a management computer system like PLEXUS IMP." (ECF No. 82-4 at 17–27).

### 3.  Westland's Qualifications

The Court need not dwell long on Trucco's argument that Westland is not qualified because (i) "his main focus is not business valuation but information technology as it relates to finance and accounting" and (ii) he is not a member of the American Institute of Certified Public Accountants ("AICPA"). (ECF No. 82-1 at 28–29). To the extent Trucco is arguing that Westland is not qualified to testify to the valuation of a business in the fruit industry, courts do "not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." Arista Records v. Lime Grp. LLC, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (citation omitted). Rather, "[t]he liberal construction of Rule 702 is exemplified by an experienced forensic accountant's ability to testify to the valuation of businesses without regard to the particular industry focus of those enterprises." Washington v. Kellwood Co., 105 F. Supp. 3d 293, 309 (S.D.N.Y. 2015).

As Redcell correctly notes, Westland has written two books on valuing technology companies, one of which Aswath Damodaran, a prominent valuation expert,[6] praised, and one on the use of data science in accounting,. (ECF No. 84 at 21; see ECF No. 82-4 at 4). Westland is also "a currently active, Licensed Certified Public Accountant . . . and beholden to the standards and rules of conduct of the Illinois CPA Society." (ECF No. 82-4 at 6). While many courts have deemed AICPA membership relevant to an accounting expert's qualifications, Trucco offers no

---

[6] See Aswath Damodaran, New York University Leonard N. Stern School of Business Faculty Directory, https://www.stern.nyu.edu/faculty/bio/aswath-damodaran (last visited Aug. 25, 2022).

legal authority requiring membership in the AICPA, as opposed to state licensure. The Court takes judicial notice of the AICPA's status as "a nation-wide professional organization for [CPAs,]" but finds no requirement that a CPA be a member of or certified by the AICPA to be qualified as an accounting expert. In re Ambassador Grp., Inc. Litig., 879 F. Supp. 237, 246 (E.D.N.Y. 1994). Indeed, "'[t]he notion that Daubert . . . requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which Daubert interprets rather than overrides, do not require that expert witnesses be academics or PhDs . . . . Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Hutch Enters., Inc. v. Cincinnati Ins. Co., No. 16-CV-1010-WMS-JJM, 2017 WL 3601899, at *4 (W.D.N.Y. Apr. 12, 2017) (quoting Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000)).

For the Court's purposes, Westland's valid licensure as an Illinois CPA, combined with his academic background, publication history, and professional experience in forensic accounting and valuation (ECF No. 83-2), are a sufficient basis on which to find that he is qualified to provide an opinion as to Redcell's estimated unjust enrichment damages that will be of use to the finder of fact. See Freesen, Inc. v. Boart Longyear Co., No. 07-3318, 2009 WL 4923598, at *3 (C.D. Ill. Dec. 8, 2009) (noting expert's membership in Illinois CPA Society); GWTP Invs., L.P. v. SES Americom, Inc., No. 3:04-CV-1383-L, 2007 WL 7630459, at *4 (N.D. Tex. Aug. 3, 2007) (finding CPA qualified as expert without reference to membership in AICPA); cf. Natchez Reg. Med. Ctr. v. Quorum Health Res., LLC, 879 F. Supp. 2d 556, 577 (S.D. Miss. 2012) (finding expert qualified to render opinion on hospital's accounting practices notwithstanding that he "lack[ed] an active CPA license and [was] not certified as a 'forensic accountant' as defined by the [AICPA]"). If

Trucco wishes to undermine Westland's aptitude for valuing the extent to which the PLEXUS IMP software benefited a fruit company, "they are free to press the point on cross-examination[,]" because "[s]uch an inquiry in his context obviously goes to the weight of [his] testimony, not its admissibility." Washington, 105 F. Supp. 3d at 309.

*     *     *

In short, the Court finds that Westland is qualified to opine as an expert on Redcell's claimed damages, his opinions and testimony are based on sufficient facts and data, he used reliable methods and applied them appropriately to the facts of this case, and his opinions—apart from the portions the Court excised above—are relevant and will aid the jury in assessing the amount of damages, if any, to award Redcell should it establish Trucco's liability.  Accordingly, Trucco's Motion is GRANTED IN PART and DENIED IN PART.

### C.  Redcell's Motion to Exclude Gottlieb

Although Redcell's Motion is no model of clarity, the Court discerns Redcell to be arguing for exclusion of Gottlieb's testimony and Report because he: (i) relies on witness interviews, documentation of which Trucco has not produced; (ii) sets forth impermissible non-expert conclusions; and (iii) is unfamiliar with Bayesian A/B testing and improperly relies on the expertise of a subordinate.  (ECF No. 89 at 12–23).  Trucco responds that Gottlieb: (i) properly relied on the witness interviews; (ii) properly relied on work performed by a colleague; and (iii) is qualified to opine on business valuation.  (ECF No. 90 at 13–20).

Although Trucco offers Gottlieb only as a rebuttal witness (ECF No. 90 at 6), the Court begins from the premise that "the standard for a rebuttal expert witness is the same as for any expert witness, though the expert's testimony should be to 'explain, repel, counteract or disprove

evidence' presented by the expert to whom he or she is responding." Faulkner, 46 F. Supp. 3d at 386 (quoting Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006)); see Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (explaining that rebuttal expert need not "produce models or methods of their own" but "must meet Daubert's threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony") (citations omitted).   A rebuttal expert may use "new methodologies . . . for the purpose of rebutting or critiquing the opinions of" the opposing party's expert.  Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009).  A district court has discretion, however, to limit a rebuttal expert's opinions to responding to the principal expert and preclude the rebuttal expert from offering "[an]other method" altogether. F.D.I.C. v. Suna Assocs., Inc., 80 F.3d 681, 687–88 (2d Cir. 1996).

Turning to Redcell's Motion, the Court finds that none of Redcell's arguments warrant excluding Gottlieb's Report and testimony altogether, although, similar to Westland, the Court will exclude certain portions, as set forth further below.

First, Gottlieb's reliance on interviews of Pacia, LoPresti, and Ivanov is not a basis for excluding his opinions altogether.  As Gottlieb testified, he did not make separate memos or notes of these interviews, but rather typed directly into his reports the information that they provided to him.  (See ECF No. 88-1 at 18).  This is therefore not a situation in which a party has failed to produce all of "the facts or data [he] considered[.]"  Fed. R. Civ. P. 26(a)(2)(B)(ii).  Because Gottlieb "incorporated into the body" of his Report "the contents of the interviews upon which [he] relies[,]" Gottlieb's failure to produce interview notes does not itself warrant preclusion.  Bd.

of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., No. 09 Civ. 686(SAS), 2011 WL 6288415, at *11 (S.D.N.Y. Dec. 15, 2011).

Turning to Redcell's second argument, that Gottlieb offers "regurgitations of [Trucco's] allegations" and "inadmissible non-expert conclusions[,]" Redcell's point is well-taken. (ECF No. 89 at 17). Gottlieb's report contains several pages summarizing Trucco's business history and giving "an overview of the dispute." (ECF No. 88-2 at 16–18). For the same reason the Court will exclude the portions of the Westland Rebuttal Report containing a lengthy factual narrative, however, the Court also excludes the portion of Gottlieb's Report, as well as any testimony he may seek to offer, in which he offers a "Condensed History" of Trucco and its predecessor entities, (id.), which is a subject matter perfectly within the ability of a lay jury to ascertain. See Fosamax, 645 F. Supp. 2d at 192; Highland Cap. Mgmt., 379 F. Supp. 2d at 469. Similarly, to the extent Gottlieb offers opinions about "the reason[s] for Trucco's growth or success," (ECF No. 88-2 at 20–21), such opinions go to an ultimate issue of fact for the jury, and are not an appropriate matter for an expert's testimony. See Duncan, 42 F.3d at 101 (explaining that, "[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's"); Lippe v. Bairnco Corp., 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding expert who improperly sought to explain "that the 'business purpose' of the transaction "was an improper one). Indeed, Gottlieb acknowledges as much, yet proceeds to offer his views anyway. (ECF No. 88-2 at 20 ("[T]he reason for the growth and profitability of the Trucco business . . . is disputed by [Trucco] and will ultimately be determined by the trier of fact.")). Accordingly, the Court excludes the

section of Gottlieb's Report beginning with "Condensed History of A.J. Trucco, Inc." through page 18, as well as his views on the reasons for Trucco's growth.  (ECF No. 88-2 at 16–18, 20–21).

Third, Redcell challenges Gottlieb's qualifications and reliance on the work of a colleague in analyzing Westland's Bayesian A/B testing.  (ECF No. 89 at 18–22).  Redcell points to Gottlieb's concession, during his deposition, that he was not familiar with Bayesian A/B testing before Trucco engaged him, and based his opinion that Westland's testing contained errors on the Bayesian A/B testing performed by his colleague, David Pratt.  (Id.; see ECF No. 88-1 at 35–39). In response, Trucco points to Gottlieb's Testimony that he prepared the tables in his Report detailing the errors in Westland's Bayesian A/B testing and that he "develop[ed] [] the opinions laid out in the report."  (ECF Nos. 88-2 at 22–24; 88-1 at 12, 14–15; 90 at 16–17).

Courts in this District have recognized that "an expert may rely on assistants or the opinions of other experts in formulating their own expert opinion[,]" Faulkner, 45 F. Supp. 3d at 385, provided "the expert supervised, directed, or participated in that work, and if the expert is qualified in the field and could perform the work themselves."  In re M/V MSC Flaminia, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017).  Experts "who simply aggregate or recite the opinions of others" should be precluded, id., because "the expert witness must in the end be giving his own opinion.  He cannot simply be a conduit for the opinion of an unproduced expert."  Malletier, 525 F. Supp. 2d at 664–66  (excluding testimony of expert witness based on another expert's regression analysis).

Here, the Court finds nothing objectionable about Gottlieb's reliance on Pratt or other assistants in preparing his Report.  Gottlieb described Pratt as one of his "staff" who "worked with [him] in reference to . . . the other finance issues related to some of the computations that

were performed and prepared by" Westland because Pratt was "more of a finance person than a forensic accountant valuation person" and was familiar with Bayesian A/B testing.  (ECF No. 88-1 at 11–12, 35).  Gottlieb testified that Pratt performed the Bayesian A/B computations (id. at 37 ("Table 18 is a summary of what David had computed"), but that Gottlieb himself prepared the tables and formulated his opinions.  (Id. at 12 ("[T]he vast majority of the work, more specifically, sir, the development of the opinions laid out in the report were developed by myself.  And the three individuals . . . really supported me in this exercise.")).  Gottlieb's Testimony refutes any suggestion that he lacked any familiarity with his opinions or "did not substantially participate in the preparation of his report."  Pac. Life Ins. Co. v. Bank of N.Y. Mellon, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021).   The circumstances of this case are thus distinguishable from those in which courts have excluded the opinions of experts who were merely a conduit for the opinion of an unproduced expert, or did not substantially draft their own reports.  See id. at 115–16 (excluding testimony of expert not because of his reliance on assistants but because "his level of involvement in the preparation of his report was [] deficient"); Faulkner, 46 F. Supp. 3d at 385–86 (excluding expert's opinion based on work of assistant who designed regression model, chose the endpoints, and constructed the model based on her own expertise without expert's supervision); Malletier, 525 F. Supp. 2d at 664–66 (excluding testimony of expert who relied on another's analysis with which he "admitted that he essentially had nothing to do").  The record reflects that Gottlieb supervised Pratt's analysis of Westland's Bayesian A/B testing, formulated his own opinion based on that analysis, and prepared his own report, as to which he was able to testify meaningfully during his deposition, and, presumably, will before the jury.  Accordingly, Gottlieb's use of Pratt falls within the permissible bounds of an expert's reliance on an assistant.

Finally, the Court rejects Redcell's argument that Gottlieb is not qualified to offer his rebuttal opinions in this case.  Gottlieb is an accredited business valuator, a CPA, and instructor in forensic accounting and valuation, and has been previously certified as an expert in valuation issues.  (ECF Nos. 88-2 at 31–37; 88-1 at 8, 45).  As a rebuttal witness, he is not expected to provide his own valuation of Trucco's business, but rather to comment on Westland's.  City of Almaty, Kazakhstan v. Ablyazov, No. 15 Civ. 5345 (AJN), 2021 WL 5154110, at *11 (S.D.N.Y. Nov. 5, 2021).  Because Gottlieb's "assessment goes beyond a lay juror's understanding of the evidence at issue here and, in line with the role of an expert, appropriately 'identif[ies] variations in the evidence or record evidence overlooked[,]'" the Court finds that his opinions have some value to the finder of fact.  Id. (quoting Scott, 315 F.R.D at 48).  How much value, of course, is a matter for the jury's determination, and an appropriate subject for cross-examination at trial, but not a basis for excluding Gottlieb's opinions altogether.  See Daubert, 506 U.S. at 596.

## IV. CONCLUSION

For the reasons set forth above:

1. Trucco's Motion is GRANTED IN PART to the extent that the following portions of Westland's Rebuttal Report and testimony are EXCLUDED:

   a. From the heading "PLEXUS IMP is a very good Software System" through and including the section with the heading "Nicola Pacia is correct; a modern business can't survive without a management computer system like PLEXUS IMP."  (ECF No. 82-4 at 17–27).

2. Redcell's Motion is GRANTED IN PART to the extent that the following portions of Gottlieb's Report and testimony are EXCLUDED:

   a. From "Condensed History of A.J. Trucco, Inc." through page 18, and any views on the reasons for Trucco's growth.  (ECF No. 88-2 at 16–18, 20–21).

3. The Motions are otherwise DENIED.

4.  The Clerk of the Court is respectfully directed to close ECF Nos. 82 and 87.

Dated:        New York, New York
              August 26, 2022

                              SO ORDERED.

                              _____
                              **SARAH L. CAVE**
                              **United States Magistrate Judge**